**Michael ROBINSON and Wendy Robinson, Plaintiffs,**

v.

**HARTZELL PROPELLER INC. and New England Propeller Service, Inc., Defendants.**

Civil Action No. 01–5240.

United States District Court, E.D. Pennsylvania.

July 21, 2004.

634

Arthur Alan Wolk, Bradley J. Stoll, Catherine B. Slavin, Christopher J. Cerski, Wolk, Genter & Harrington, Philadelphia, PA, for Plaintiff.

Ann T. Field, James E. Robinson, Patrick J. O'Connor, Paul K. Leary, Jr., Cozen & O'Connor, Philadelphia, PA, Robert P. Dennison, Reger & Rizzo, LLP, Prussia, PA, Geraldine D. Zidow, Mckissock & Hoffman, PC, J. Bruce McKissock, McKissock & Hoffman, P.C., Philadelphia, PA, for Defendant.

### MEMORANDUM

DuBOIS, District Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* .................................................... 635

II. *BACKGROUND* ................................................... 636
 A. ENGINEERING REPORT 213 ........................................ 637
 B. HARTZELL'S ALLEGED CONCEALMENT FROM THE FAA ........... 640
 C. OVERHAUL REQUIREMENTS ...................................... 642
 D. 1989 PROPELLER OVERHAUL .................................... 643

III. *DISCUSSION* ...................................................... 644
 A. STANDARD FOR SUMMARY JUDGMENT ........................... 644
 B. THE GENERAL AVIATION REVITALIZATION ACT OF 1994
 ("GARA") ..................................................... 645
 C. GARA § 2(B): KNOWING MISREPRESENTATION, OR
 CONCEALMENT, OR WITHHOLDING EXCEPTION ................. 646
 1. *Hartzell's Motions in Limine to Preclude Testimony of Dr.*
 *McSwain and Mr. Twa* ...................................... 647
 2. *Evidence of Knowing Misrepresentation* ........................... 649
 a. High Vibratory Stress ...................................... 649
 b. Dampers .................................................. 650
 c. Placards .................................................. 650
 d. Required Information ....................................... 651
 e. Causally Related .......................................... 652
 f. Evidence of Scienter ...................................... 652
 3. *Evidence of Concealment or Withholding From the FAA* ........... 654
 a. Blaming Propeller Failures on Other Causes .................. 654
 b. Relaxation of Inspection Requirements ...................... 655
 c. New Stress Curves ........................................ 656
 d. Required Information ....................................... 657
 e. Causally Related .......................................... 659
 D. GARA § 2(a)(2): NEW PARTS ..................................... 660
 1. *Maintenance Manual* ........................................ 660
 2. *Propeller Overhaul* ......................................... 663

E. NEW ENGLAND PROPELLER SEVICE'S MOTION FOR
 SUMMARY JUDGMENT ..........................................664
 1. *Evidence that an Overhaul was Conducted*..........................664
 2. *Evidence of Negligent Overhaul*.......................................666
 3. *Motion in Limine to Preclude Testimony of Dr. McSwain* .............667
F. CONSTITUTIONALITY OF GARA ..................................668

IV. *CONCLUSION* .................................................669

## I. INTRODUCTION

This civil action arises out of claims by plaintiffs, Michael and Wendy Robinson, against defendants Hartzell Propeller Inc. ("Hartzell") and New England Propeller Service, Inc. ("NEPS") for damages stemming from injuries they suffered in a 1999 plane crash. In the Complaint, plaintiffs allege that the accident occurred when one of the propeller blades on their aircraft failed. Hartzell designed and manufactured the propeller. It is alleged that NEPS performed maintenance on the propeller.

Plaintiffs claim, *inter alia*, that the propeller failure was caused by Hartzell's negligent design of the propeller. Plaintiffs also contend that Hartzell was aware of the propeller's defective design and misrepresented the design problems to the Federal Aviation Administration ("FAA") when the propeller was certified for use and concealed the propeller's propensity for failure from the FAA after certification. With respect to NEPS, plaintiffs allege negligence in the performance of maintenance on the propeller. Based on these allegations, plaintiffs asserted claims against Hartzell for negligence (Count I), strict liability (Count II), and fraud (Count III) and against NEPS for negligence (Count IV).

Presently before the Court are Hartzell's Motion for Summary Judgment Pursuant to the General Aviation Revitalization Act of 1994 ("GARA"), Pub.L. No. 103–298, 108 Stat. 1552 (reprinted in notes for 49 U.S.C.A. § 40101), Hartzell's Motion in Limine to Preclude the Testimony of William Ray Twa, Hartzell's Motion in Limine to Preclude the Testimony of Richard H. McSwain, Ph.D., P.E., Hartzell's Motion in Limine to Preclude Expert Testimony Relating to the Insufficiency of Hartzell Manuals, NEPS's Motion for Summary Judgment, and NEPS's Motion to Exclude Plaintiffs' Expert Richard H. McSwain From Testifying Regarding Propeller Overhaul.

In its Motion for Summary Judgment, Hartzell argues that GARA's eighteen year statute of repose bars plaintiffs' claims because the propeller at issue was installed on the aircraft more than eighteen years before the accident. In response, plaintiffs claim that (1) based on Hartzell's alleged misrepresentations and concealment, their claims are subject to GARA's "knowing misrepresentation or concealment or withholding" exception and the statute of repose does not apply; or, in the alternative, (2) under GARA's "new part" provision, the eighteen year period began when Hartzell issued an overhaul manual in 1984 or when the propeller was overhauled in 1989.

In its Motion for Summary Judgment, NEPS argues that plaintiffs have produced no evidence that it performed any maintenance on plaintiffs' aircraft. In the alternative, NEPS contends that, even if it performed maintenance on the aircraft, there is no admissible evidence that the maintenance was performed negligently.

Hartzell argues in its Motions in Limine that Mr. Twa and Dr. McSwain should not be permitted to testify about Hartzell's

state of mind or scienter. In the Motion in Limine concerning Hartzell manuals, Hartzell contends that the testimony of Dr. McSwain, Jerry D. Foster, A.J. Fielder, and Donald E. Sommer on the sufficiency of the overhaul manuals and procedures should be excluded because these experts base their conclusions on facts not in evidence. NEPS claims in its in limine motion that Dr. McSwain is not qualified to offer testimony on propeller overhaul.

For the reasons set forth in this Memorandum, both Hartzell's Motion for Summary Judgment Pursuant to GARA and NEPS's Motion for Summary Judgment are denied. Hartzell's motions to preclude the testimony of Mr. Twa and Dr. McSwain are granted with respect to the opinions on the issue of Hartzell's state of mind or scienter. The motions in limine are denied in all other respects. Hartzell's Motion in Limine to preclude testimony on the sufficiency of its manuals is denied without prejudice. NEPS's motion in limine to exclude Dr. McSwain's testimony is denied. These rulings in limine are without prejudice to defendants' right to object to testimony and other evidence presented by all such experts at trial.

## II. BACKGROUND

On August 15, 1999, Michael and Wendy Robinson were injured when they were forced to make an emergency crash landing in their Mooney M20E aircraft near Prattsburg, New York. Compl. 13, 14, 16; Hartzell's Motion for Summary Judgment Pursuant to the General Aviation Revitalization Act of 1994 ("Hartzell's Mot.") at 2 & Ex. 1 (National Transportation Safety Board Factual Report Aviation, ID No. NYC99LA 202 ("NTSB Report")). Plaintiffs allege that, as a result of the crash, Wendy Robinson fractured her spine, breast bone, and left foot; Michael Robinson's injuries resulted in permanent paraplegia. Compl. 17–20.

Plaintiffs aver in the Complaint that a propeller blade fractured during the flight, causing the crash landing. Id. 16. According to an investigation conducted by the National Transportation Safety Board, the fracture occurred in the "mid-blade" region of the propeller. Hartzell's Mot. at 2 & Ex. 1 (NTSB Report). The plane was equipped with a propeller manufactured by Hartzell, model number HC–C2YK–17666–2, made of 2025–T6 aluminum. Compl. 16, 27, Hartzell's Mot. at 2. According to Hartzell, the propeller blade was manufactured on August 8, 1974 and installed on plaintiffs' aircraft on or about October 17, 1974. Hartzell's Mot. at 3, Ex. 4 (Aff. of Thomas McCreary, Hartzell's Safety Investigation Manager) 3, 6. Plaintiffs claim that it was "inspected, repaired, maintained, serviced, overhauled, certified, and returned to service" by NEPS in 1989, prior to the accident. Id. 26.

The plane was equipped with a IO–360–A1A engine manufactured by Lycoming. Compl. 24, Hartzell's Mot. at 2. Plaintiffs state in the Complaint that "[t]his particular aircraft and engine combination was known to create a harmonic between the blade and the engine, which could and did result in the development of stress corrosion and cracks within the blade." Compl. 31. On this issue, plaintiffs claim that the "[t]he seriousness and risk of such a harmonic was not made known to the flying public, aircraft owners, or the FAA. In fact, ... Hartzell misled the FAA into believing that any cause of failures were overspeeding or surface generated corrosion pits, rather than as a result of the harmonic between the engine and the propellers." Id. 33. It is plaintiffs' position that "high damaging vibration stresses generated by the engine/propeller system caused a fatigue crack in the propeller

blade which ultimately resulted in the fracture of the propeller in mid-flight." Pls.' Resp. at 2.

In addition to the vibration problems associated with the engine/propeller combination, plaintiffs argue that the aluminum used to construct the propeller had a "propensity" for "corrosion pitting and inter-granular corrosion." With respect to this allegation, plaintiffs claim that the maintenance instructions included in a Hartzell Overhaul Manual dated June 29, 1984 were inadequate to detect corrosion pits or cracks. Pls.' Resp. at 4. According to plaintiffs, the overhaul manual should have required visual inspection with a magnifying glass. *Id.* at 4 & Ex. A (McSwain Aff.) at 10(t). Plaintiffs further allege that Hartzell allowed the FAA to relax inspection requirements which required a careful inspection to detect corrosion and stress cracks in order to "cover up" the design defects. Compl. 34–40, 42–43. Finally, plaintiffs allege that Hartzell failed to notify "the FAA of numerous aircraft accidents in which it was either known or suspected that the cause of the accident was a propeller system problem" despite the fact that this "information was required to be disclosed and ... was material and relevant to the performance, maintenance, operation, and continued airworthiness of the accident aircraft." Compl. 44, 46.

The Complaint originally named several defendants in addition to Hartzell and NEPS—Columbia Aircraft Services, Textron Lycoming Reciprocating Engine Division, Textron, Inc., and Avco Corp. The Complaint against Columbia Aircraft Services was dismissed without prejudice by agreement on February 21, 2002. Plaintiffs filed a Notice of Voluntary Dismissal Without Prejudice as to Textron Lycoming, Textron, and Avco in the Court of Common Pleas of Philadelphia County before the case was removed to this Court.

In addressing the issues raised by Hartzell's Motion for Summary Judgment, the Court must examine the facts related to the knowing misrepresentation or concealment or withholding exception to GARA, starting with Engineering Report 213 ("ER 213"). An analysis of Hartzell's arguments with respect to GARA's new part provision requires an examination of Hartzell's overhaul instructions and the maintenance history of the propeller. The maintenance history is also relevant to NEPS's Motion for Summary Judgment.

## A. ENGINEERING REPORT 213

On March 24, 1959, Hartzell began applying for a type certificate for the accident model propeller. In order to certify the use of this propeller with the engine installed on plaintiffs' aircraft, Hartzell conducted a vibration test with the accident model propeller and engine during the week of July 8, 1963. Hartzell recorded the results of this test in Engineering Report 213, dated August 22, 1963, and submitted the report to the FAA. *See* Pls.' Resp. at 8 & Ex. L (ER 213), Ex. M (FAA Statement of Compliance of Aircraft or Aircraft Components with the Civil Air Regulations); Hartzell's Mot. at 11, Ex. 22 (Sep. 5, 1963 letter from FAA acknowledging receipt of ER 213).

During this test, strain gauges were placed on the propeller blades to measure strain at different locations on the blade during different flight conditions. Pls.' Resp. at 9. These measurements were recorded on four different graphs. These graphs show the stress on the propeller (measured in pounds per square inch ("p.s.i.")) at different propeller speeds (measured in revolutions per minute ("r.p.m.")) for four different flight condi-

tions.[1] The graphs also include a line at 4700 p.s.i. labeled "allowable." Hartzell's Mot. at Ex. 22 (ER 213); Pls.' Resp. at Ex. C (William Ray Twa Aff) 6–7. According to plaintiffs, these graphs show that the stresses on the propeller exceeded the allowable limit at three separate points.

Mr. Twa, one of plaintiffs' experts, states: "The test results revealed that vibratory stresses exceeded the allowable limits for the Static Full Throttle, 24″ Manifold Pressure Level Flight, and Full Throttle Level Flight Conditions. For the Static Throttle condition at 2250 r.p.m., the stress was 5,000 p.s.i. at blade station 30″ where the allowable stress is 4,800 p.s.i. For the 24″ Manifold Pressure Level Flight condition at 2300 r.p.m., the stress level was 5,600 p.s.i. with an IO–360 engine, 180 hp and 23″ manifold pressure. The allowable stress was 4,800 p.s.i. For the Full Throttle Flight condition at about 2210 r.p.m., the stress level at station 30 was 5,100 p.s.i. with an allowable stress of 4,800 p.s.i.." [Citations omitted.] Pls.' Resp. at 9 (citing Exhibit L (ER 213) & Exhibit C (Twa Aff.) 7).[2]

Hartzell's written summary of these graphs states:

> The peak stress at 2230 r.p.m. reached a value of 4800 p.s.i. for the 24 inch manifold setting, which is approximately the allowable value. Since this engine has no dampers which can wear and cause higher stresses, the probability of this value being reached or exceeded in service seems remote. There appears to be no necessity to placard against operation in the 2200–2300 r.p.m. range.

Pls.' Resp. at 9 & Exhibit L (ER 213). Plaintiffs argue that this statement contains three misrepresentations: (1) the peak stress was not approximately equivalent to the allowable value, it exceeded the allowable value; (2) instead of reducing stress on the propeller, the fact that dampers were not installed on this aircraft increased the stresses on the propeller; and (3) despite Hartzell's statement to the contrary, placards were necessary to limit operation at certain propeller speeds. *Id.* at 9–10.

Plaintiffs point to Mr. Twa's analysis of the graphs as evidence that Hartzell misrepresented the level of stress reflected by the graphs. For evidence that dampers do not increase the stress on a propeller, plaintiffs provided a letter from Hartzell in which Hartzell suggested installing dampers on an aircraft to reduce stress.[3] Pls.' Resp. at 10 & Exhibit N (April 13, 1972 letter from David Biermann, Hartzell President, to FAA).

---

1. The flight conditions were: takeoff and climb at full throttle, level flight at full throttle, level flight with throttle set at 24″ manifold pressure, and static at full throttle. Pls. Resp. Ex. L (ER 213).

2. Mr. Twa's report errs in two respects. First, it states that the allowable stress is 4800 p.s.i. whereas the allowable stress is 4700 p.s.i. This means that the allowable stress was exceeded by an additional 100 p.s.i.

 Second, Mr. Twa's statement regarding the 24″ Manifold Pressure Level Flight is only partially correct. The 5600 p.s.i. stress level he referred to in his report was recorded on an O–360 engine, not the IO–360 engine mod-el installed on plaintiffs' aircraft. However, the stress measured on the IO–360 for this flight condition exceeded the allowable limit by 100 p.s.i. Because the allowable limit is exceeded, Mr. Twa's conclusion is not affected.

 The Court notes that plaintiffs had a poor photocopy of ER 213 which might explain Mr. Twa's errors. The Court's determinations are based on an examination of the original ER 213 which was produced by Hartzell after oral argument on the motions.

3. A damper is a weight placed on the crankshaft of an aircraft's engine to reduce engine vibrations. Tr. at 133.

As evidence that Hartzell's statement about placards was a misrepresentation, plaintiffs state that, despite Hartzell's statement in ER 213 that placards were not necessary, the FAA required warnings to pilots about operating at certain speeds. Tr. of Aug. 25, 2003 Hearing/Oral Argument ("Tr.") at 110. When the propeller was certified, the propeller's Type Certificate Data Sheet included a Note requiring owners of Mooney M20E aircraft to mark their tachometers in red between 2000 and 2350 r.p.m. to indicate a restriction on continuous operation in this engine speed range. Pls.' Resp. Ex. O (Type Certificate Data Sheet) at 51. On May 28, 1965, the FAA issued AD 65–12–13 which changed the red arc on the tachometer to limit operation between 2100 and 2350 r.p.m. and required an addition to the flight manual to explain this operating restriction.[4] Id. Ex. P (AD 65–12–13). In 1977, AD 77–12–06 required the installation of a placard near the tachometer to inform pilots that "continuous operation" should be avoided between 2000 and 2350 r.p.m. or above 2600 r.p.m. in "full throttle level flight." Id. Ex. J (AD 77–12–06) at 2.

Plaintiffs allege that Hartzell had Delegated Option Authority ("DOA") at the time the propeller was certified. According to plaintiffs, in order for a part to be certified, a manufacturer typically submits an application and supporting material to the FAA and the FAA decides whether to approve the application. However, DOA allows an employee of a manufacturer, called the Designated Engineering Representative ("DER"), to assume the FAA's role and certify a part. Id. at 7, Ex. K (Dep. of Tim Smyth, engineer for FAA) at

148. After certification, according to Hartzell's Delegation Option Authorization Manual, "the DOA organization is responsible to ensure that the product design is in accordance with the regulations and has no characteristics which may detract from flight safety. Service difficulties are to be reviewed, reported, and resolved in accordance with section 13.0 of this manual." Pls.' Supp. Resp. Ex. C (Hartzell Delegation Option Authorization Manual) at 7. Section 13.0 of the manual mandates that the reporting of failures, malfunctions, and defects be consistent with 14 C.F.R. § 21.3. Id. at 16. According to plaintiffs, "[t]hrough its DOA, Hartzell certified the accident propeller/IO–360–A1A engine combination and intentionally misrepresented to the FAA that the combination was safe." Pls.' Resp. at 7. In support of its contention that Hartzell certified the accident propeller/engine combination through its DOA, plaintiffs submitted the affidavit of Mr. Twa, a former DER for Bell Helicopter and FAA employee, in which he states that "Hartzell approved certification of the accident model propeller through its Delegated Option Authority." Id. at 7, Ex. C (Twa.Aff.) 1–5. Hartzell disputes this evidence and claims it received DOA in 1967, four years after ER 213 was submitted to the FAA. Hartzell's Combined Reply at 12, n. 7.[5]

Plaintiffs argue further that vibration testing for the propeller/engine combination should have been conducted after Hartzell developed new allowable stress limits in the early 1980s. Pls.' Supp. Resp. at 6. According to plaintiffs, these new limits more accurately represented the

---

4. AD stands for "airworthiness directive." "FAA's airworthiness directives are legally enforceable rules that apply to the following products: aircraft, aircraft engines, propellers, and appliances." 14 C.F.R. § 39.3

5. Plaintiffs claim Hartzell has not responded to their request for documents concerning Hartzell's DOA, including the initial application for DOA submitted to the FAA. Pls. Resp. at 7, n. 6.

stresses on older propellers in combination with damaged or worn engines. *Id.* The allowable stress curves were altered from the straight lines used in ER 213. The new curves were higher for some operating conditions and lower for others. Pls.' Supp. Resp. at 6 & Exhibit A (Dep. of Robert Edinger) at 213–14, 219–20. Plaintiffs claim that the FAA "recommended" that Hartzell re-conduct vibration surveys in accordance with these new limits. *Id.* In the April 6, 1981 letter cited by plaintiffs as evidence of this recommendation, the FAA advised Hartzell that "[v]ibration surveys should be conducted with representative service conditions. That is, high-time engines with poor timing or one misfiring cylinder—particularly if the resultant vibration would not be readily apparent to the pilot." *Id.* Ex. D (Apr. 6, 1981 letter from W. Horn, Chief of FAA Engineering & Manufacturing Branch, to W. Harlamert, Hartzell's Vice President for Engineering). Hartzell claims that it used the new allowable limits from 1981 forward when certifying new propellers. Hartzell's Combined Rep. at 19, n. 15, Pls.' Supp. Resp. Ex. A (Edinger Dep.) at 219–20.

Plaintiffs argue Hartzell continued to abuse its DOA after certification of the propeller at issue. "Once certification was accomplished, Hartzell could easily deal with the problems in the propeller through its DOA authority and it did so by concealing the vibration problem and leading the FAA to believe that the cause of the frequent propeller failures were other than what Hartzell knew them to be." Pls.' Resp. at 10.

## B. HARTZELL'S ALLEGED CONCEALMENT FROM THE FAA

According to plaintiffs, "[w]hile Hartzell concealed the source of the high damaging vibratory stresses which caused failures, many accident model propellers installed on undamped engines were failing." *Id.* at 12. Plaintiffs did not specify how many propellers failed, but they submitted a list of propeller failures described as a "Service Difficulty Report" at oral argument. *Id.* at Ex. Q (Service Difficulty Report); Tr. of Aug. 25, 2003 Hearing/Oral Argument ("Tr.") at 98. Although plaintiffs did not explain who compiled this list or how it was produced, Tim Smyth, an engineer for the FAA, testified that the FAA uses service difficulty reports to learn of product failures. Hartzell's Mot. Ex. 3 (Smyth Dep.) at 100. Each page of the report states that the list was "prepared from official FAA records." Pls.' Resp. Ex. Q (Service Difficulty Report). An independent review of this exhibit by the Court revealed that the list contains reports of a number of propeller failures involving the same propeller/engine combination as the one at issue in this case and analyzed by ER 213—a Hartzel HCC2YK1 propeller and a Lycoming IO–360 engine.[6] At oral

**6.** This exhibit is actually a compilation of numerous service difficulty reports. The following report control numbers which appear on the exhibit identify service difficulty reports that describe failures with this propeller/engine combination: 1978042400043, 1974072600068, 1974102300032, 1975051200037, 1975080600042, 1975082800090, 1976081300063, 1976083000057, 1977050400030, 1977091400030, 1978021400123, 1978080800125, 1981081300102, 1976071900036, 1976102200049, 1977022200049, 1986091100007, 1976092800031, 1977020900038, 1978042800049, 1979070600055, 1979121300039, 1982101800043, 1981100100035, 1976030900087, 1976090200039, 1984102600053, 1986050800073. 1974072400036, 1974071000044, 1976111700028, 1977121900045, 1979032600035, 1979112900039, 1980080800029, 1983110400030, 1990071200080, 1977090200059, 1990120500052, 1980042300040, If the engine model was not

argument, counsel for Hartzell argued that there were only two reports of "mid-blade" failures involving the accident model propeller. Tr. at 70–71. In making this argument, counsel did not refer to any authority and he did not state that he was relying on the Service Difficulty Report submitted by plaintiffs. Moreover, the Service Difficulty Report does not specify which blade failures occurred at mid-blade and there is no evidence that the reported blade failures at other locations are not relevant.

On this issue, the Court notes that neither party presented evidence that precisely defined what is meant by reference to the mid-blade of a propeller. According to Hartzell, "the 'mid-blade' area refers to that region of the propeller blade that is between the 'blade shank' (also called the 'blade retention radius'), i.e., the area at one end of the blade that is inserted into the propeller hub, and the 'blade tip,' the extreme outer region of the blade." Hartzell's Mot. at 2. This general definition is not disputed and is supported by an illustration provided by Hartzell and Mr. Smyth's testimony. Id. Ex. 2 (Illustration of Propeller Blade), Ex. 3 (Smyth Dep.) at 17–19. However, neither the illustration nor the Smyth testimony define the length of the "extreme outer area" or the "blade tip." Plaintiffs' counsel stated at oral argument that the blade tip is about three inches long, but he offered no evidence to support this definition. Tr. at 116.

According to plaintiffs, the FAA relied on Hartzell to investigate the failures identified in the Service Difficulty Report and report the cause of these failures to the FAA because Hartzell had DOA. Tr. at 98. Plaintiffs argue that, instead of reporting

the actual cause of these failures, "Hartzell's approach to addressing the defects in the accident model propeller has been to preclude operation of the engine in certain RPM ranges and to put limitations in the flight manual, reduce the manifold pressure or redline the tachometer, blame inaccurate engine tachometers for the failures, and blame pilots for exceeding RPM limitations. However, these measures [did] not address the high vibrations generated from the undamped engine/propeller combination." Pls.' Resp. at 11.

Plaintiffs presented expert testimony, letters Hartzell sent to the FAA, and Hartzell accident reports in support of their argument that Hartzell blamed other factors instead of disclosing the propeller/engine vibration problem. One of plaintiffs' experts, Mr. Twa, stated in his affidavit that the measures recommended by Hartzell did "not address the high vibratory stress levels that [caused] the propellers to fail. It is Hartzell's responsibility to both identify and quantify these high damaging stresses and provide an engineering design change to move these stresses out of the aircraft r.p.m. range, or eliminate them altogether." Id. Ex. C (Twa Aff.) 11. In a report dated August 17, 1973, Hartzell noted that the aircraft required a placard and stated that "[i]f this placard is ignored by the pilot, the tachometer is incorrect, or the pilot reads the RPM incorrectly due to a parallax, then it would be possible to be operating in a high stressed area. This would accentuate a failure if the leading edge damage is present." Id. Ex. U (Engineering Report 405) 4. Hartzell also concluded in another report involving the same propeller model that "also present were high vibratory

identified but the aircraft was listed as a Mooney M20E or M20F, the Court, drawing all inferences in favor of plaintiffs, included the failure on the list. According to Hartzell Service Bulletin 118A, Lycoming IO–360 series

engines were installed on both the Mooney M20E and Mooney M20F, and there is no evidence to the contrary. Pls.' Resp. Ex. J (Service Bulletin 118A) at 3.

stresses due to operation in objectionable RPM ranges." *Id.* Ex. T (Engineering Report 506 dated July 8, 1977) at 1. In a November 10, 1976 letter to the FAA, Hartzell stated that "the cracks found in the 7666A–2 blades are primarily caused by inaccurate tachometers." *Id.* Ex. V (Nov. 10, 1976 letter to FAA from R. Grimes, Hartzell President) at 2. Finally, plaintiffs claim the following statement in a Hartzell Service Bulletin blames propeller failures on pilots exceeding the operating limits imposed by the FAA:

> It has been found that these limits are being exceeded creating excessive stresses on the propeller, engine and even the aircraft structure. Shank failures are occurring which can only be due to higher stresses than tested. Overspeeding is the most serious cause of high stresses because the centrifugal force is increased by the square of the RPM, and in many installations the vibratory stresses increase also.

*Id.* Ex. S (Bulletin No. 118B dated Nov. 28, 1977) at 1.

## C. OVERHAUL REQUIREMENTS

Plaintiffs also claim that defendants' overhaul procedures were inadequate to detect corrosion problems that were aggravated by the high vibrations. It is plaintiffs' position that a corrosion pit was the "initiation point" for the fatigue fracture that caused the propeller failure at issue and a number of corrosion pits were not detected when the propeller was overhauled in 1989. Pls.' Resp. at 17, Ex. A (McSwain Aff.) 10(r); Hartzell's Mot. Ex. 1 (NTSB Report) at 1a. According to plaintiffs, "the combination of corrosion pits and high vibratory stresses created a condition conducive to blade cracking." *Id.* at 15. Specifically, plaintiffs claim Hartzell's procedures only addressed problems with the blade retention radius or blade shank and not the mid-blade. *Id.* at 15.

Plaintiffs argue in their Supplemental Response that, from 1984 to 2000, Hartzell's overhaul manual did not require that any maintenance be performed on the accident propeller. According to plaintiffs, Hartzell Overhaul Manual 133B, issued in 1984, "only directed maintenance action to the 'hard alloy propeller blades.'" Pls.' Supp. Resp. at 8, Ex. E (TRW Hartzell Propeller Blade Repair Manual 133–B) at 29. Plaintiffs claim the accident propeller was constructed of an aluminum that was "not considered a hard alloy." *Id.* at 8, Ex. F (McSwain Aff.) 8–12.

Hartzell disputes this contention. First, Hartzell argues that plaintiffs took one page of the 1984 manual out of context and that the same manual also contained inspection requirements for all blades and that these instructions mandated the use of a 10x magnifying glass. Hartzell's Combined Reply at 22, Ex. C (Hartzell Propeller Blade Repair Manual 133–B) at 62. In addition, Hartzell argues that in 1984 maintenance personnel were required to consult a number of different manuals to properly overhaul a propeller. *Id.* at 22–23.

Plaintiffs also argue that Hartzell was "aware that the propeller material was subject to corrosion pitting." "Rather than requesting that the FAA issue an AD mandating propeller airfoil blade preventative maintenance, in 1991, Hartzell convinced the FAA to relax the inspection interval for compliance with AD 77–12–06." Pls.' Resp. at 15. In this directive, the FAA mandated that the propellers be compression rolled, imposed new RPM restrictions, and changed some inspection requirements. Pls.' Resp. at 15 & Exhibit J. Compression rolling, or "cold rolling," involves rolling heavy steel rollers over the propeller blade to increase the strength of the propeller metal. Pls.' Resp. at 5. In

1991, the FAA changed the interval for compliance with AD 77–12–06 from an inspection after every 2000 hours of time-in-service to an inspection after every 12,000 hours of time-in-service. Pls.' Resp. at 16, Hartzell's Mot. at Ex. 13 (FAA Airworthiness Directive 77–12–06 Compliance Section).

Hartzell disagrees with plaintiffs' position that it convinced the FAA to relax AD 77–12–06 inspection requirements. In contrast, Hartzell claims that it expressed some concerns about the relaxation of this requirement in a letter to the FAA. "Hartzell was concerned that the public might mistakenly think that the FAA's 'relaxation' of the blade shank inspection requirement also applied to Hartzell specified overhauls." Hartzell's Mot. at 6, Ex. 11 (April 3, 1990 letter from R. Edinger, Hartzell Vice President, to FAA). According to Hartzell, its recommended overhaul period ranged from the lesser of 1000 hours of use or four calendar years in 1969 to the lesser of 2000 hours or 5 calendar years in 1986. *Id.* at 9, Ex. 17 (Hartzell Service Letter No. 61 dated May 9, 1969), Ex. 10 (Hartzell Service Letter 61R dated Feb. 28, 1992). Hartzell contends that its overhaul procedure was more comprehensive than the maintenance required by AD 77–12–06 because it contained steps for detecting corrosion in all areas of the blade, not just the shank. *Id.* With respect to this issue, Hartzell points to the fact that it obtained FAA approval to include a note in one of its service letters warning owners that its overhaul periods were not changed by the modification to the AD 77–12–06 maintenance intervals. *Id.* at 7, Ex. 12, Ex. 13, Ex. 14 (correspondence between FAA and Hartzell regarding notice in Hartzell service letter), Ex. 10 (Hartzell Service Letter 61R) at 3.[7]

Hartzell further argues that the propeller was not overhauled as frequently as recommended by Hartzell's manuals. According to Hartzell, the aircraft's maintenance records only contain two entries related to propeller maintenance: (1) small nicks on the blade surface were filed out in 1978; and (2) the propeller was removed for compliance with AD 77–12–06 in 1989. *Id.* at 13, Ex. 27 (Excerpts from maintenance log). Hartzell claims that "under the applicable service guidelines for this propeller blade five or six overhauls should have been performed since Plaintiff's propeller blade was installed." Hartzell's Combined Reply at 2, Ex. A (Dep. of T. McCreary, Hartzell Air Safety Investigation Manager) at 25–26.

## D. 1989 PROPELLER OVERHAUL

Maintenance work performed on the propeller in 1989 is the basis for plaintiffs' claims against NEPS. In 1989, according to aircraft logs, the propeller was removed from the airplane for maintenance. The parties dispute what maintenance was done and who performed the maintenance. NEPS argues that "plaintiffs cannot prove that NEPS had any involvement whatsoever with the aircraft propeller that is the subject of the lawsuit." NEPS's Mot. for Summ. J. ("NEPS's Mot.") at 1.

According to plaintiffs, the propeller was sent to NEPS in 1989 for both overhaul in accordance with Hartzell's Overhaul Manual and maintenance required by AD 77–12–06. To substantiate this claim, plaintiffs provide maintenance records from the

---

**7.** The FAA proposed completely removing AD 77–12–06's shank inspection requirements in 2001, stating: "Since the issuance of Hartzell SL 61R there have been no reports of cracked blades in the blade shank retention radius (when the propeller complied with AD 77–12–06)." 66 Fed.Reg. 58077 (Nov. 20, 2001). This proposal became final in 2002. 67 Fed. Reg. 31113 (May 9, 2002).

aircraft and the affidavit of Dr. Richard McSwain. The maintenance records, labeled "Airworthiness Directive Compliance Record" and "Airworthiness Directives," contain an entry stating that AD–77–12–06 was preformed by "N.E. Propeller" in July of 1989. Pls.' Mot. in Opp'n to NEPS's Mot. for Summ. J. ("Pls.' Opp'n to NEPS") Ex. C (Airworthiness Directives), Ex. D (Airworthiness Directive Compliance Record). In addition, the flight log contains the following entry signed by J. Hardy: "removed Hartzell propeller for 77–12–06 AD—Accomplished by N.E. Propeller. See yellow tag back of this book—Reinstalled on A/C." *Id.* Ex. E (Flight Log).

As further evidence linking NEPS to the accident propeller, Dr. McSwain stated that his chemical analysis of the propeller revealed that both an overhaul and maintenance covered by AD 77–12–06 were performed. That conclusion was based on his finding that polyurethane paint was uniform in composition and appearance over the entire blade surface. *Id.* at Ex. A, McSwain Aff. 10(m), 10(n) & Ex. A. (Materials Engineering Report) at 5–6. According to Dr. McSwain, AD 77–12–06 only requires repainting the blade in the shank radius area, not the entire blade, leading him to conclude that both AD 77–12–06 maintenance and an overhaul were performed on the accident propeller in 1989. *Id.* 10(q).

In his report, Dr. McSwain stated that "[t]he failure of [NEPS] to completely remove the corrosion pits from the subject Hartzell 'Y' shank blade and to apply polyurethane paint over the corrosion pits made subsequent detection of the corrosion pitted condition unlikely." Pls.' Resp. at 4, Ex. A (McSwain Aff.) 10(r). He also opined that Hartzell's inspection procedures were "inadequate to detect the pitting on the blade" because "the pits on surface of the subject Hartzell 'Y' shank

blade were not detectable visually without magnification" and the Hartzell overhaul procedure did not require an inspection with magnification. *Id.* Ex. A (McSwain Aff.) 10(u), (McSwain Materials Engineering Report) 4.0(12), 4.0(19).

In response, NEPS provided the affidavit and deposition of its President, Arthur D'Onofrio, stating that the company has no records dating back to 1989. NEPS's Mot. at Ex. C (D'Onofrio Aff.) 5–8 & Ex. E (D'Onofrio Dep.) at 20, 41. NEPS also claims that the maintenance record entries relied upon by plaintiffs were not made by NEPS and the person whose name appears next to the entries, J. Hardy, is deceased and not subject to cross examination. *Id.* at 3 & Ex. C (D'Onofrio Aff.) 10.

Plaintiffs contend that John Hardy, now deceased, a former employee of the Little Brook, Maine airport, was the airplane's mechanic in 1989. According to plaintiffs, Hardy singed the logbook entries showing that the accident propeller was sent to "N.E. Propeller" for maintenance. Pls.' Opp'n to NEPS at 9 & Ex. C (Airworthiness Directives Record), Ex. D (Airworthiness Directive Compliance Record), Ex. E (Flight Log). As evidence that this signature was Mr. Hardy's, plaintiffs submitted the affidavit of Jean Hardy, John Hardy's widow. *Id.* at Ex. J (Jean Hardy Aff.) 3. In her affidavit, she identifies the signatures and entries as those of her husband. *Id.* 3. She also states that her husband "dealt with New England Propeller Service." *Id.* 4.

## III. *DISCUSSION*

### A. STANDARD FOR SUMMARY JUDGMENT

"[I]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any materi-

al fact and that the moving party is entitled to a judgment as a matter of law[,]" summary judgment should be granted. Fed.R.Civ.P. 56(c). The Supreme Court describes the summary judgment determination as "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, "a motion for summary judgment must be granted unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir.1987).

"[O]n summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348. "If reasonable minds can differ as to the import of proffered evidence that speaks to an issue of material fact, summary judgment should not be granted." *Gelover v. Lockheed Martin*, 971 F.Supp. 180, 181 (E.D.Pa.1997).

■ Evidence submitted with a motion for summary judgment must be in a form "as would be admissible at trial and thus must be 'reducible to admissible evidence.'" *Williams v. West Chester*, 891

F.2d 458, 466 (3d Cir.1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "However, the Supreme Court has rejected the view that 'the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.'" *Id.* (quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548). Evidence that is "capable of being admissible at trial" can be considered on a motion for summary judgment. *Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 (3d Cir. 1996). Thus, the Court may consider evidence that is not admissible in the submitted form if the party offering the evidence could satisfy the applicable admissibility requirements at trial. For example, "hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony, i.e. 'in a form that would be admissible at trial.'" *Williams*, 891 F.2d at 466 n. 12.

## B. THE GENERAL AVIATION REVITALIZATION ACT OF 1994 ("GARA")

Hartzell argues that GARA bars plaintiffs' claims because this suit was initiated more than eighteen years after the propeller was added to the aircraft. GARA provides:

(a) **In general.**—Except as provided in subsection (b), no civil action for damages for death or injury to persons or damage to property arising out of an accident involving a general aviation aircraft may be brought against the manufacturer of the aircraft or the manufacturer of any new component, system, subassembly, or other part of the aircraft, in its capacity as manufacturer if the accident occurred—

(1) after the applicable limitation period beginning on—

 (A) the date of delivery of the aircraft to its first purchaser or lessee, if delivered directly from the manufacturer; or

 (B) the date of first delivery of the aircraft to a person engaged in the business of selling or leasing such aircraft; or

(2) with respect to any new component, system, subassembly, or other part which replaced another component, system, subassembly, or other part originally in, or which was added to, the aircraft, and which is alleged to have caused such death, injury, or damage, after the applicable limitation period beginning on the date of completion of the replacement or addition.

GARA § 2(a). The "applicable limitation period" is eighteen years. GARA § 3(3).

■■■ GARA is a statute of repose, not a statute of limitations. Statutes of limitations prohibit lawsuits if a period of time has elapsed after an accident occurs or is discovered. Statutes of repose bar suits brought more than a certain period of time after a product is manufactured and delivered to the purchaser. *Burroughs v. Precision Airmotive Corp.*, 78 Cal.App.4th 681, 93 Cal.Rptr.2d 124, 130 (2000). Hartzell asserts that the accident propeller was manufactured and installed on plaintiffs' aircraft in 1974, and plaintiffs produce no evidence to dispute this contention. Hartzell's Mot. at 3–4. The accident occurred in 1999, twenty-five years after this installation. Thus, GARA bars a suit based on the propeller unless an exception to the general provisions applies.

Plaintiffs offer two theories to explain why their suit is not barred by GARA. First, plaintiffs argue that Hartzell knowingly misrepresented pertinent information to the FAA and concealed material information from the FAA. GARA § 2(b). Second, plaintiffs present two arguments based on GARA's "new parts" provision: (1) the eighteen year period began when Hartzell issued an overhaul manual in 1984; or (2) the period began when the propeller was overhauled in 1989. *See* GARA § 2(a)(2). If any one of these arguments is successful, the eighteen year statute of repose will not bar the plaintiffs' action and summary judgment will be denied.

## C. GARA § 2(B): KNOWING MISREPRESENTATION, OR CONCEALMENT, OR WITHHOLDING EXCEPTION

Plaintiffs claim that Hartzell's intentional misrepresentations to the FAA or concealment or withholding of material information from the FAA should prevent Hartzell from seeking the protection of GARA's statute of repose. GARA lists a number of exceptions to its restrictions on civil actions. Among others, GARA offers no repose if:

[T] he claimant pleads with specificity the facts necessary to prove, and proves, that the manufacturer with respect to a type certificate for, or obligations with respect to continuing airworthiness of, an aircraft or a component, system, subassembly, or other part of an aircraft[,] knowingly misrepresented to the Federal Aviation Administration, or concealed or withheld from the Federal Aviation Administration, required information that is material and relevant to the performance or the maintenance or operation of such aircraft, or the component, system, subassembly, or other part, that is causally related to the harm which the claimant allegedly suffered[.]

GARA § 2(b).

■■■ To take advantage of what the Court will refer to as GARA's "knowing

misrepresentation or concealment or withholding" exception, plaintiffs must prove: (1) knowing misrepresentation, or concealment, or withholding; (2) of required information that is material and relevant; (3) that is causally related to the harm they suffered. *See Rickert v. Mitsubishi Heavy Indus., Ltd.*, 923 F.Supp. 1453, 1456 (D.Wyo.1996). It is not sufficient for a plaintiff to allege that the aircraft was negligently designed. The plaintiff must offer evidence that the defendant knowingly misrepresented or concealed or withheld this design defect in communications with the FAA. *See Rickert v. Mitsubishi Heavy Indus., Ltd.*, 929 F.Supp. 380, 384–85 (D.Wyo.1996).

Plaintiffs produce evidence that they assert establishes knowing misrepresentation or concealment or withholding by Hartzell. First, they claim ER 213, a report submitted to the FAA in 1963, contained a number of misrepresentations. Second, they contend that Hartzell engaged in a decades long effort to conceal the misrepresentations in this report from the FAA, and in the process, either misrepresented or concealed the cause of numerous propeller failures in communications with the FAA. Hartzell objected to some of the evidence submitted in support of these arguments and filed two Motions in Limine to exclude evidence.

1. ***Hartzell's Motions in Limine to Preclude Testimony of Dr. McSwain and Mr. Twa***

Because both of these Motions rely on similar arguments, they will be considered together. According to Hartzell, certain opinions of Dr. McSwain and Mr. Twa should be excluded because "they invade the province of this Court in rendering judgments on matters of law and the jury's authority to determine the ultimate issue of intent." Hartzell's Mot. in Limine to Preclude Testimony of William Ray Twa ("Hartzell's Twa Mot.") at 2. "The [knowing misrepresentation or concealment or withholding] exception is factually driven and requires the jury, not an expert, to review and weigh all documents that may support a misrepresentation claim and determine whether Hartzell in fact misrepresented or concealed material to the FAA." *Id.* at 3.

■ "Under Rule 702, when 'faced with a proffer of expert scientific testimony ... the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact issue.'" *ProtoComm Corp. v. Novell Advanced Servs.*, 171 F.Supp.2d 473, 476 (E.D.Pa.2001) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). "It is now well settled that this gatekeeping function extends beyond scientific testimony to testimony based on 'technical' and 'other specialized' knowledge.'" *Id.* (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

Although the proposed experts offer technical and specialized testimony, Hartzell does not question their qualifications or the admissibility of their technical testimony. For example, "Hartzell does not challenge Mr. McSwain's testing methods with respect to the Y-shank blade." Hartzell's Mot. in Limine to Preclude Testimony of Richard H. McSwain ("Hartzell's McSwain Mot.") at 1. Hartzell only challenges the admissibility of opinions concerning its state of mind when it made statements to the FAA.

■ Following the reasoning in *In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 WL 876900, 2000 U.S. Dist. LEXIS 9037 (E.D.Pa. June, 20, 2000), the

Court concludes that intent is not a proper subject for expert testimony. As stated by the court in *Diet Drugs*, "[t]he question of intent is a classic jury question and not one for experts." *Id.*, 2000 WL 876900, *9, 2000 U.S. Dist. LEXIS 9037 at *29 (quoting *Voilas v. General Motors Corp.*, 73 F.Supp.2d 452, 464 (D.N.J.1999)). "If the witnesses' bases for the opinions concerning improper intent come from other evidence such as letters, admissions of AHP officers or employees, or other admissible evidence, that is what the jury should hear and the question of AHP's intent would flow from such evidence to be determined by the jury." *Id.* (quoting *City of Tuscaloosa v. Harcros Chem. Inc.*, 158 F.3d 548, 565 (11th Cir.1998)). Moreover, "[e]ven if such an opinion was relevant, there are serious problems with the reliability of these opinions. The witnesses are qualified in particular scientific disciplines. These disciplines do not include knowledge or even experience in the manner in which corporations and the pharmaceutical marketplace react, behave or think regarding their non-scientific goals of maintaining a profit-making organization...." *Id.* at, 2000 WL 876900, **9–10, 2000 U.S. Dist. LEXIS 9037, *28–29.

■ Hartzell argues that Mr. Twa should not be able to testify that Hartzell "intentionally misled" the FAA, Hartzell's Twa Mot. at 1, and that he cannot render an opinion "as to the alleged state of mind of Hartzell." *Id.* at 3. For example, Hartzell objects to Mr. Twa's statement that Hartzell "knew" the vibratory stresses caused by the engine/propeller combination exceeded permissible limits and "intentionally misled" the FAA that this combination was safe. Pls.' Resp. Ex. C (Twa Aff.) at 8, 15. According to Hartzell, in order to make this judgment, Mr. Twa would need to review every piece of correspondence between Hartzell and the FAA from 1960 to the present and be privy to all phone calls, meetings, and other communication between the parties. Hartzell's Twa Mot. at 3.

With respect to Dr. McSwain, Hartzell argues that "his belief that the FAA was misled is a factual issue, not one that requires scientific or technical knowledge." Hartzell's McSwain Mot. at 4. "Hartzell seeks to preclude Richard McSwain from providing opinion testimony on Hartzell's alleged misrepresentations for the same reason set forth in its Motion to Preclude William Twa. Mr. McSwain should not be allowed to offer his impressions as to whether Hartzell misled the FAA as said testimony invades the province of this Court in rendering judgments of law and the authority of the jury in determining the ultimate issues in this case." *Id.* at 4. Moreover, Dr. McSwain has "absolutely no experience in providing assessments and evaluations of fraud/misrepresentation claims." Hartzell's Reply to Pls.' Opp'n to Mot. to Preclude Testimony of McSwain at 2. Specifically, Hartzell objects to Dr. McSwain's conclusion that the combination of, *inter alia*, the accident blade material and "inadequate inspection procedures" combined to "mislead the FAA concerning the continued airworthiness of the subject blade" and argues that Dr. McSwain "does not explain how this alleged combination of events evidences a misrepresentation to the FAA." *Id.* at 4, 6.

The Court concludes that the experts' experience in metallurgy, propeller design, propeller maintenance, and FAA reporting requirements does not qualify them to testify as to the subjective intent of Hartzell employees. However, this does not mean that these experts should be precluded from testifying about such matters as what Hartzell's vibration tests revealed or what information should have been disclosed to the FAA.

Thus, in deciding the pending motions, the Court will not rely on either expert's

statements regarding Hartzell's state of mind or scienter, but it will consider their opinions about matters that are within their areas of specialized knowledge—for example, whether the results of Engineering Report 213 show that stresses exceeded allowable limits. This ruling is without prejudice to Hartzell's right to object to questions put to the experts and other evidence offered by the experts at trial.

■ Hartzell also claims that the experts did not rely on all the facts in evidence when forming their opinions. "Determinations regarding the weight to be accorded, and the sufficiency of, the evidence relied upon by the proffered expert are within the sole province of the jury." *Walker v. Gordon,* 46 Fed.Appx. 691, 695 (3d Cir.2002). In *Walker,* the Third Circuit affirmed this Court's decision not to grant a *Daubert* hearing to a plaintiff who made an argument similar to Hartzell's because what the plaintiff was arguing in the Motion—the failure of an expert to rely on all of the evidence in the case—was "a proper subject for cross examination." *Id.* Plaintiffs' experts alleged failure in this case to consider all facts in evidence is not a basis for exclusion of their testimony.

### 2. *Evidence of Knowing Misrepresentation*

Plaintiffs claim that ER 213, a report Hartzell was required to submit to the FAA to receive a type certificate for the propeller, contains several knowing misrepresentations. *See supra* § II(A); Pls.' Resp. at 8 & Exhibit L (ER 213). "A type certificate is a certificate issued by a government agency to an aircraft or component part manufacturer to reflect the agency's determination that the aircraft or component part meets applicable regulatory standards." *Bain v. Honeywell Int'l, Inc.,* 167 F.Supp.2d 932, 939 (E.D.Tex. 2001).

■ It is plaintiffs' position that the written summary of the graphs attached to ER 213 contains three specific misrepresentations. First, plaintiffs claim that "Hartzell knew that the accident model propeller when used in conjunction with the IO–360–A1A [the accident engine] experienced damaging vibratory stresses which exceeded permissible limits." Pls.' Resp. at 9 & Exhibit C (Twa Affidavit) 8. Second, plaintiffs state that Hartzell knew this aircraft needed dampers, and Hartzell's statement that a dampened engine could lead to higher stress was a misrepresentation. *Id.* at 9. Third, plaintiffs contend that Hartzell knew a placard was necessary to warn pilots about operating at certain propeller speeds to avoid exceeding allowable stress levels. Pls.' Resp. at 10 & Exhibit M (Statement of Compliance of Aircraft or Aircraft Components With the Civil Air Regulations).

### a. High Vibratory Stresses

With respect to the first alleged misrepresentation, which relates to vibratory stresses, Hartzell does not dispute that, according to the graphs appended to ER 213, the vibratory stresses on the propeller exceeded the allowable limits whereas the report summary stated that measured stress was "approximately" the allowable value. At oral argument, Hartzell's counsel admitted that "in certain conditions measured vibratory stresses ... exceeded the maximum allowable stress limits of the propeller." Tr. at 60–61. However, Hartzell argues that the graphs were included with the report, so the FAA would have been able to make this determination itself. *Id.* Plaintiffs respond by arguing that providing the graphs was inadequate, especially when the engineers at the FAA who reviewed the document were not familiar with propeller engineering. *Id.* at 131.

The Court finds that Hartzell's statement that the measured stresses were "approximately" the allowable value is not equivalent to a statement that these stresses exceeded the allowable levels. Specifically, the evidence presented raises a genuine issue of material fact as to whether Hartzell's statement that the peak stresses reached "approximately the allowable value" during the vibration test was a misrepresentation. The inclusion of the graphs and the summary in the report are relevant to the jury's determination of whether Hartzell made this statement knowingly, but it does not correct the misstatement as a matter of law.

### b. Dampers

Plaintiffs also claim Hartzell falsely represented in ER 213 that "the use of an undamped engine lessened the probability of the existence of a dangerous condition." Tr. at 130; Pls.' Resp. at 10. According to plaintiffs, "[Hartzell] knew that vibration dampers were critical to the prevention of failed propeller blades." Tr. at 130. As evidence of this misrepresentation, plaintiffs provided a letter from Hartzell in which Hartzell suggested installing dampers on a different aircraft to reduce stress. Pls.' Resp. at 10 & Exhibit N (April 13, 1972 letter from David Biermann, Hartzell President, to FAA).

In response, Hartzell argues that the recommendation to use dampers, applied to a different aircraft, with a different propeller and a different engine, nine years after the statement in ER 213, without more, is not evidence that Hartzell knew dampers would reduce stresses on the accident aircraft propeller when it submitted ER 213. Hartzell's Combined Reply at 17.

In ER 213, Hartzell states that an engine with dampers that become worn could produce higher stresses, not that dampers increase stress. Pls.' Resp. at Ex. L (ER 213). A 1977 letter from Hartzell to the FAA discussing three incidents of past propeller failure clarifies Hartzell's statement in ER 213. According to the letter, "[d]amper systems are very intricate and must be maintained like a watch. There isn't a propeller made that can withstand the punishment of a detuned system." Pls.' Resp. at Ex. R (Letter from R.V. Grimes, Hartzell President, to the FAA).

There is no evidence that Hartzell's statement about dampers was a misrepresentation. Specifically, plaintiffs have not produced evidence to refute Hartzell's statement that worn dampers can produce higher stresses. Thus, plaintiffs have not raised a genuine issue of material fact with respect to whether this statement was a misrepresentation.[8]

### c. Placards

Finally, plaintiffs argue that, despite Hartzell's statement to the contrary in ER

8. In a Motion to Compel, plaintiffs stated that Hartzell Engineering Report 159 ("ER 159") is probative on the issue of whether Hartzell was aware of the vibration problem from undamped engines of the type involved in the crash. Hartzell refused to produce the document during discovery, claiming it was not relevant on the ground that it involved a different aircraft, a different propeller, and a different engine.

By separate order dated July ____, 2004, the Court granted the Motion to Compel.

Based on the evidence before the Court at this time, it concludes that Hartzell's statement in ER 213 about worn dampers producing higher stresses is not a misrepresentation. However, in view of the argument that ER 159 provides additional evidence on that issue, this ruling of the Court on summary judgment is without prejudice to plaintiffs' right to offer evidence at trial that Hartzell's statement about dampers was a misrepresentation.

213, placards were necessary to warn against operation at certain speeds. Plaintiffs contend that operating restrictions imposed by the FAA after certification demonstrate that Hartzell's statement was a misrepresentation. Tr. at 110. On this issue, as discussed in Section II(A) of this Memorandum, there is evidence that the FAA required the tachometers of planes equipped with the accident model propeller and engine to be marked in red in order to signify an operating restriction and later required the installation of a placard in addition to this marking.

According to Hartzell, the FAA mandated the installation of a placard in response to Hartzell's Service Bulletin 118A, which contained a requirement for the installation of a similar placard. Hartzell's Mot. at 11, Ex. 7 (SB 118A) at 2. Hartzell also claims that the FAA's initial decision to mark the tachometer in red was based on analysis and testing performed by Hartzell. Hartzell's Combined Reply at 18, Pls.' Supp. Resp. Ex. A (Edinger Dep.) at 85. In response, plaintiffs argue that Mooney, not Hartzell, originally recommended marking the tachometer. Tr. at 93.

The operating restrictions imposed by the FAA raise a genuine issue of material fact as to whether Hartzell's statement concerning operating restriction placards in ER 213 was a misrepresentation. Any later efforts Hartzell may have made to correct this misrepresentation by asking the FAA to impose operating limits do not cure the initial misrepresentation as a matter of law.

**d. Required Information**

In order to satisfy the second requirement of the GARA "knowing misrepresentation or concealment or withholding" exception, plaintiffs must show that Hartzell was required to submit the documents that allegedly contained misrepresentations to the FAA. To receive a type certificate, Hartzell had to conduct a vibration test and submit this test to the FAA. Civil Air Regulations ("CAR") § 14.152.[9] Moreover, in order to receive a type certificate, Hartzell was required to "establish the propeller operating limitations as chosen by the applicant" based on the results of this and other tests. 14 C.F.R. § 14.16 (1963). Thus, Hartzell's statement as to operating restrictions was also required. Based on this evidence, the Court concludes that plaintiffs have satisfied the "required information" element of the knowing misrepresentation test with respect to the alleged misrepresentations contained in ER 213.

Finally, plaintiffs argue that Hartzell was able to mislead the FAA because Hartzell had Delegated Option Authority ("DOA") at the time the propeller was certified and was able to "stand in the shoes" of the FAA in approving the propeller for certification. Pls.' Resp. at 6–7. As noted in Section II(A) of this Memorandum, the parties dispute whether the propeller was certified pursuant to this authority.

It is not necessary for the Court to decide whether Hartzell certified the accident propeller pursuant to its DOA. To receive a type certificate, Hartzell was required to submit the vibration test and

9. "Propellers with metal blades and/or metal hubs shall be subjected to a vibration test under sufficient conditions to establish the level of vibratory stresses in the blade and/or hub when the propeller is operated under all conditions of rotational speed and engine power which are to be established for the propeller. The test shall be conducted with the same or equivalent engine and the test stand configuration on which the endurance tests are conducted." 14 C.F.R. § 14.152. This regulation became effective on March 5, 1952 and was still in force in 1963. 14 C.F.R. § 14.152 (1963), 17 F.R. 1105.

establish operating limitations, whether it had DOA or not. 14 C.F.R. § 14.152 (1963). Hartzell's DOA status is, however, relevant to plaintiffs' concealment claims, and the parties agree that Hartzell had DOA during the time period of the alleged concealment. *See infra* § III(C)(3)(d).

### e. Causally Related

To satisfy the third requirement of GARA's "knowing misrepresentation or concealment or withholding" exception, plaintiffs must demonstrate that the misrepresentations were causally related to the accident. In addressing this requirement, plaintiffs rely on Mr. Twa's opinion that the graphs incorporated in ER 213 showed that the accident model propeller/engine combination "experienced damaging vibratory stresses ... within the normal engine r.p.m. operating ranges." Pls.' Resp. Ex. C (Twa Aff.) 8. These "excessive vibratory stresses that occur within the normal operating range, power range and airspeed limits of aircraft" were the "primary reasons" for propeller blade failures. *Id.* 11.

At oral argument, Hartzell's attorney argued in response that the high stresses identified in ER 213 are at the tip of the blade and these stresses are not related to stresses in the mid-blade region where, according to the NTSB Report, the propeller failed. On this issue, the graphs demonstrate that stresses measured by the two gauges on the tested propeller that were located on either side of the point of fracture on the failed propeller were less than the allowable limit. Tr. at 62, 69–71, 142–44. The strain gauge that measured stresses above the allowable limit in ER 213 was located at the 30 inch station, seven inches from the end of the blade. Pls.' Resp. at Exhibit L (ER 213). According to the accident report, plaintiffs' propeller separated at a point 27 inches

from the tip of the blade. Pls.' Resp. at 2. This part of the blade is between the location of two of the gauges used to measure stress in ER 213—the 20 inch station, positioned 17 inches from the tip of the blade, and the 0 station, located at the blade shank. The stresses measured at these two locations, as reported in ER 213, were less than the allowable limit during testing. Pls.' Resp. at Exhibit L (ER 213). Hartzell, however, presented no evidence that stress 7 inches from the tip of the blade (at the 30 inch station) is not related to stress at the point of failure or that the propeller failure at issue was not related to this stress.

Mr. Twa opined that the high stresses identified by ER 213 are causally related to the failure of plaintiffs' propeller and Hartzell presented no evidence to the contrary. Specifically, Hartzell presented no evidence that the propeller failure at issue was not related to stress at the point seven inches from the tip of the blade (at the 30 inch station) on the ER 213 graphs. Thus, the Court concludes that plaintiffs have presented a genuine issue of material fact on this issue.

### f. Evidence of Scienter

Hartzell's final argument is that plaintiffs have not satisfied the "strict scienter requirement" set forth in GARA's "knowing misrepresentation" exception. Hartzell's Mot. at 19. According to Hartzell, "Plaintiff's Response omits the critical scienter requirement for the GARA misrepresentation exception and fails to come forward with evidence of intentional or fraudulent conduct on the part of Hartzell." Hartzell's Combined Reply at 14. The Court rejects this argument.

The Court agrees with Hatzell's statement in its Motions in Limine relating to Dr. McSwain and Mr. Twa that it is the "jury's authority to determine the ultimate

issue of intent." "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Hunt v. Cromartie,* 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999). "The issue of intent is 'particularly inappropriate for resolution by summary judgment' because evaluating state of mind often requires the drawing of inferences from the conduct of parties about which reasonable persons might differ." *Justofin v. Metro. Life Ins. Co.,* 372 F.3d 517, 524 (3d Cir.2004) (quoting *Riehl v. Travelers Ins. Co.,* 772 F.2d 19, 24 (3d Cir.1985)). Summary judgment should not be granted when "there is disagreement over what inferences can be reasonably drawn from the facts, even when the facts are undisputed." *Tumolo v. Triangle Pacific Corp.,* 46 F.Supp.2d 410, 415 (E.D.Pa.1999).

Hartzell cites *Rickert v. Mitsubishi Heavy Indus., Ltd.,* 923 F.Supp. 1453 (D.Wyo.1996) as support for the statement that "even if Plaintiffs had proof Hartzell submitted incorrect information to the FAA (which they did not), such evidence would not prove intentional and fraudulent conduct under GARA § 2(b)(1)." Hartzell's Combined Reply at 15. The Court concludes that Hartzell's reliance on *Rickert* is misplaced for two reasons.

First, this case is distinguishable from *Rickert* and *Cartman v. Textron Lycoming Reciprocating Engine Div.,* No. 94–72582, 1996 WL 316575, 1996 U.S. Dist. LEXIS 20189 (E.D.Mich. Feb.27, 1996), the other case cited by Hartzell, because there is evidence in this case of two affirmative misrepresentations—(1) Hartzell's statement that the peak stress measured by ER 213 was "approximately the allowable value;" and (2) the statement that it was not necessary to install a placard. In both of the cases cited by Hartzell, the courts stated that the plaintiff failed to produce evidence of a misrepresentation. *See Cartman,* 1996 WL 316575, *3, 1996 U.S. Dist. LEXIS 20189, at *10–11 ("plaintiff has submitted no proof that this defendant misrepresented or concealed information to the FAA with respect to a type or airworthiness certificate"), *Rickert,* 923 F.Supp. at 1458 ("Nothing that Kennedy says in his report concerning de-icing leads this Court to conclude that Mitsubishi represented something to the FAA that it knew to be untrue or that it made any representations to the FAA with the intent to deceive.").

Second, the "mistakes" in submissions to the FAA identified by the plaintiff in *Rickert* can be distinguished from the misrepresentations at issue in this case. For example, the plaintiff's expert in *Rickert* stated that the defendant used the wrong airfoil—called the Joukowski airfoil—to make de-icing calculations and the airfoil used was "not representative" of the airfoil on the accident aircraft and, as a result, "misrepresented the aerodynamic properties of this aircraft to the FAA." *Rickert,* 923 F.Supp. at 1458. According to the *Rickert* court, even if the defendant used the wrong airfoil, "this does not mean—and [the plaintiff's expert] has not stated—that [the defendant] told the FAA it used one airfoil but in fact used the Joukowski airfoil, or that [the defendant] concealed from the FAA the fact that it used the Joukowski airfoil in its calculations. [The defendant] may have used the wrong airfoil for its calculations (and the Court will assume that it did), but that is a mistake, not a misrepresentation." *Id.*

The alleged misrepresentations in this case are different from the statements alleged to have been actionable in *Rickert.* In this case, plaintiffs have pointed to affirmative misstatements in a report submitted to the FAA—misstatements about vibrations that were in excess of the allow-

able limit and the need for placards. On the other hand, the plaintiffs in *Rickert* argued that the defendant used the wrong airfoil during testing but did not contend that the results of this test were reported inaccurately to the FAA. If the statements in *Rickert* and this case were comparable—for example, if Hartzell had tested the propeller with the wrong engine and stated this fact in ER 213—the Court's conclusion on this issue might be different.

To the extent that *Rickert* stands for the proposition that to defeat summary judgment plaintiffs in this case must produce additional "evidence of intentional or fraudulent conduct on the part of Hartzell" to satisfy "the critical scienter requirement of the GARA misrepresentation exception," the Court rejects *Rickert.* Hartzell's Combined Reply at 14. This evidentiary standard is inappropriate for summary judgment and conflicts with Third Circuit and Supreme Court precedent. Issues of intent are "particularly inappropriate" for summary judgment and should be decided by the jury. *Hunt v. Cromartie,* 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999), *Riehl v. Travelers Ins. Co.,* 772 F.2d 19, 24 (3d Cir.1985). As Hartzell correctly stated in its Motion in Limine, this determination "is factually driven and requires the jury, not an expert, to review and weigh all documents that may support a misrepresentation claim and determine whether Hartzell in fact misrepresented or concealed material to the FAA." Hartzell's Twa Mot. at 3.

Plaintiffs have presented sufficient evidence that the misrepresentations contained in ER 213 were made knowingly to withstand summary judgment. Thus, the motion will not be granted on this issue.

### 3. *Evidence of Concealment or Withholding From FAA*

#### a. Blaming Propeller Failures on Other Causes

Plaintiffs argue that, after making the alleged misrepresentations during propeller certification, Hartzell attempted to conceal these misrepresentations from the FAA and withheld information from the FAA that would have notified the FAA that the high stresses were causing problems with the propeller. According to plaintiffs, "[w]hile Hartzell concealed the source of the high damaging vibratory stresses which caused failures, many accident model propellers installed on undamped engines were failing." *Id.* at 12.

The parties disagree about the number of propeller blade failures that are documented by evidence in the record. Plaintiffs did not quantify the number of blade failures or explain the origin of the document, Service Difficulty Report, they submitted as evidence of these failures.[10] *See supra* § II(B). At oral argument, Hartzell's counsel admitted that there were two reports of "mid-blade" failures involving the accident model propeller. Tr. at 70–71. Thus, both parties agree that there is evidence of propeller failures involving the same propeller model prior to plaintiff's accident. Any dispute about the number of propeller failures or whether the number of propeller failures was

10. Hartzell did not object to the admission of this exhibit. Although the document is not admissible in its current form because a foundation for the documents' admissibility has not been laid, it could be admissible at trial if plaintiffs' witnesses testify to its admissibility as either a business record under Federal Rule of Evidence 803(6) or a public record under Federal Rule of Evidence 803(8). Because this evidence is "capable of being admissible at trial," the Court will consider it for the purposes of this motion for summary judgment. *Philbin v. Trans Union Corp.,* 101 F.3d 957, 961 (3d Cir.1996).

sufficient to put Hartzell on notice of a design defect is appropriate for resolution by the jury.

Plaintiffs argue that, instead of stating the actual cause of these reported failures, "Hartzell's approach to addressing the defects in the accident model propeller has been to preclude operation of the engine in certain RPM ranges and to put limitations in the flight manual, reduce the manifold pressure or redline the tachometer, blame inaccurate engine tachometers for the failures, and blame pilots for exceeding RPM limitations. However, these measures [did] not address the high vibrations generated from the undamped engine/propeller combination." Pls.' Resp. at 11.

In support of their argument that Hartzell blamed other factors instead of disclosing the propeller/engine vibration problem, plaintiffs point to expert testimony, letters sent by Hartzell to the FAA, and Hartzell accident reports. *See supra* § II(B). In summarizing this evidence, one of plaintiffs' experts, Mr. Twa, stated in his affidavit that the measures recommended by Hartzell did "not address the high vibratory stress levels that [caused] the propellers to fail. It is Hartzell's responsibility to both identify and quantify these high damaging stresses and provide an engineering design change to move these stresses out of the aircraft r.p.m. range, or eliminate then altogether." *Id.* Ex. C (Twa Aff.) 11.

The Court concludes that the evidence submitted by plaintiffs is sufficient to raise a genuine issue of material fact with respect to whether Hartzell misrepresented, concealed, or withheld the actual cause of propeller failures. According to Mr. Twa, the true cause of the failures was the high vibratory stress reported by ER 213. Plaintiffs' evidence raises a genuine issue of material fact as to whether Hartzell blamed the failures on other factors, in-

cluding pilot error and inaccurate tachometers. Based on this evidence, a jury could infer that Hartzell was aware of the high vibratory stress that resulted from the propeller/engine combination but blamed propeller failures on other factors to conceal this problem.

**b. Relaxation of Inspection Requirements**

Plaintiffs also claim that Hartzell's communications with the FAA about inspection requirements concealed the fact that high vibratory stresses on the propeller were causing failures. In 1977, Hartzell issued a service bulletin to address problems with propeller blades, and this plan was adopted by the FAA as AD 77–12–06. *See supra* § II(C); Pls.' Resp. at 15, Exhibit S (Service Bulletin 118B), & Exhibit J (AD 77–12–06). Plaintiffs argue that Hartzell knew the inspection requirements recommended by Hartzell's service bulletin were insufficient to deal with problems caused by high vibratory stress and corrosion. Pls.' Resp. at 15.

Plaintiffs further argue that Hartzell misled the FAA by requesting a relaxation of even these minimal inspection requirements when it knew these inspections were not capable of identifying propeller corrosion problems. *Id.* at 24. As evidence of this alleged deception, plaintiffs point to the fact that the FAA changed the interval for compliance with AD 77–12–06 from an inspection after every 2000 hours of time-in-service to an inspection after every 12,-000 hours of time-in-service in 1991. Pls.' Resp. at 16, Hartzell's Mot. at Ex. 13 (FAA Airworthiness Directive 77–12–06 Compliance Section).

According to Hartzell, the change in required inspections from 2000 hours to 12,-000 hours of time-in-service was not based on a request or even a suggestion from Hartzell. In fact, Hartzell produced evi-

dence that it expressed a concern about the relaxation of this requirement in letters to the FAA and the FAA allowed Hartzell to include a warning in a service bulletin to address this concern. *See supra* § II(D). Specifically, Hartzell reported to the FAA that it was concerned plane owners would mistakenly interpret the relaxation of the AD 77–12–06 interval as a change to its recommended schedule for performance of its own maintenance and overhaul procedures. According to Hartzell, its overhaul procedure was more comprehensive than the AD 77–12–06 requirements.

The Court finds that there is no evidence that Hartzell asked the FAA to relax propeller inspection requirements. To the contrary, the evidence demonstrates that Hartzell advocated for more stringent inspection requirements. Thus, the Court concludes that Hartzell did not misrepresent or conceal the need for more stringent inspection requirements in communications with the FAA.

Hartzell also argues that the propeller was not maintained in compliance with the schedule mandated by Hartzell or the FAA. According to Hartzell, the aircraft's maintenance records only disclose two entries related to propeller maintenance: (1) small nicks on the blade surface were filed out in 1978; and (2) the propeller was removed for compliance with AD 77–12–06 in 1989. *Id.* at 13, Ex. 27 (Excerpts from maintenance log). Hartzell claims that "under the applicable service guidelines for this propeller blade five or six overhauls should have been performed since Plaintiff's propeller blade was installed." Hartzell's Combined Reply at 2, Ex. A (Dep. of T. McCreary, Hartzell Air Safety Investigation Manager) at 25–26. Although relevant to the issue of contributory negligence at trial, this evidence is not relevant to Hartzell's GARA motion.

### c. New Stress Curves

Plaintiffs further argue that vibration testing should have been repeated after Hartzell developed new allowable stress limits. Pls.' Supp. Resp. at 6. In the early 1980s, Hartzell determined that the allowable stress levels should be adjusted to more accurately reflect operating conditions and the fact that different areas on the blade experienced different stresses during flight. Pls.' Supp. Resp. at 6 & Exhibit A (Dep. of Robert Edinger) at 213–14, 219–20, *see supra* § II(A). Plaintiffs claim that the FAA "recommended" that Hartzell re-conduct vibration surveys in accordance with these new limits. *Id.*

Plaintiffs' allegations regarding re-testing of the propellers are not supported by the evidence they submitted. In the April 6, 1981 letter relied upon by plaintiffs, the FAA told Hartzell that "[v]ibration surveys should be conducted with representative service conditions. That is, high-time engines with poor timing or one misfiring cylinder-particularly if the resultant vibration would not be readily apparent to the pilot." *Id.* Ex. D (Apr. 6, 1981 letter from W. Horn, Chief of FAA Engineering & Manufacturing Branch, to W. Harlamert, Hartzell's Vice President for Engineering). Hartzell states that it used the new allowable limits from 1981 forward when certifying new propellers. Hartzell's Combined Rep. at 19, n. 15, Pls.' Supp. Resp. Ex. A (Edinger Dep.) at 219–20. There is no evidence that the FAA ordered or even asked Hartzell to retest propellers that had already been certified.

Even if the FAA had ordered or asked Hartzell to retest the accident propeller, there is no evidence that Hartzell falsely represented that it conducted this testing or concealed the fact that it failed to conduct this testing. Thus, plaintiffs fail to raise a genuine issue of material fact with

respect to whether there was a knowing misrepresentation or concealment of information concerning the new allowable stress levels and the need for retesting.

### d. Required Information

In order for the GARA "knowing misrepresentation or concealment or withholding" exception to apply to plaintiffs' claims relating to the misrepresentation or concealment of information about propeller failures, plaintiffs must also show that Hartzell was required to submit the information that was allegedly misrepresented, concealed, or withheld from the FAA.

Under 14 C.F.R. § 21.3, "the holder of a type certificate ... shall report any failure, malfunction, or defect in any product or part manufactured by it that it determines has resulted in any of the occurrences listed in paragraph (c) of this section." 14 C.F.R. § 21.3(a).[11] A propeller structural failure is one of the listed occurrences. 14 C.F.R. § 21.3(c)(5). "The holder of a type certificate has a duty to report any failure, malfunction, or defect in any product, part, process, or article manufactured by it that it determines has resulted in problems." *Bain v. Honeywell Int'l, Inc.*, 167 F.Supp.2d 932, 939 (E.D.Tex.2001); *see also Butler v. Bell Helicopter Textron, Inc.*, 109 Cal.App.4th 1073, 135 Cal.Rptr.2d 762, 770 (2003) (stating that 14 C.F.R. § 21.3 imposes an affirmative duty on manufacturers to report failures of parts it manufactures). Hartzell received a type certificate for the accident model propeller. Pls.' Resp. at 10–11, Ex. O (Type Certificate Data Sheet) at 19. Significantly, Hartzell admits that "it recognizes and abides by the requirements of CFR 21.3." Hartzell's Mot. at 23. Accordingly, as the holder of a type certificate, Hartzell had a responsibility to report any propeller failures or defects.

In addition, as a DOA, Hartzell had an obligation to monitor the continued airworthiness of the propeller. Hartzell admits that it had DOA in 1967. Hartzell's Combined Reply at 12, n. 7. According to Hartzell's Delegation Option Authorization Manual, after certification "the DOA organization is responsible to ensure that the product design is in accordance with the regulations and has no characteristics which may detract from flight safety. Service difficulties are to be reviewed, reported, and resolved in accordance with section 13.0 of this manual." Pls.' Supp. Resp. Ex. C at 7. Section 13.0 of the manual mandates that the reporting of failures, malfunctions, and defects will be consistent with 14 C.F.R. § 21.3. *Id.* at 16. Thus, as a DOA, Hartzell had a responsibility not only to report propeller failures but to resolve problems with the propeller. According to its own manual, Hartzell had a duty to ensure the design of the accident propeller had no characteristics that detracted from flight safety.

Plaintiffs claim Hartzell abused its responsibility and authority as a DOA and the holder of a type certificate. According to plaintiffs, "[t]hrough its DOA, Hartzell certified that the accident propeller/IO–360–A1A engine combination and intentionally misrepresented to the FAA that the combination was safe." Pls.' Resp. at 7. "Once certification was accomplished, Hartzell could easily deal with the problems in the propeller through its DOA authority and it did so by concealing the

---

**11.** This requirement became effective on November 30, 1970. 35 F.R. 18187 (Nov. 28, 1970). Thus, it was applicable at the time Hartzell sent the first letter cited by plaintiffs on August 17, 1973 and at the time of the first propeller failure listed in Exhibit Q—1974. Pls.' Resp. Ex. U (Engineering Report 405), Ex. Q (Service Difficulty Reports); *supra* note 12.

vibration problem and leading the FAA to believe that the cause of the frequent propeller failures were other than what Hartzell knew them to be." *Id.* at 10. According to Mr. Twa, a former FAA employee and DER for Bell Helicopter, "[i]t is Hartzell's responsibility to both identify and quantify these high damaging stresses and provide an engineering design change to move these stresses out of the aircraft rpm range, or eliminate them altogether." Pls.' Resp. Ex. C. (Twa Aff.) 11.

In response, Hartzell argues that plaintiffs have not produced evidence that it "failed to provide data about the vibration stress of the engine/propeller combination at issue after 1964 required by direct inquiry from the FAA." Hartzell's Combined Reply at 19. This argument fails to recognize Hartzell's affirmative duty to report a defect or design problem with the accident propeller. Hartzell was not supposed to wait for the FAA to identify a problem. To the contrary, Hartzell had a responsibility to identify any problems, investigate the problems, and report a solution to the problems to the FAA.

Hartzell relies on *Rickert* for the additional argument that the regulations do not require it "to notify the FAA every time that an engineer, a pilot, or a civilian writes that a particular aircraft should have been designed differently or that it is flawed." Hartzell's Combined Rep. at 21 (quoting *Rickert*, 929 F.Supp. at 384–85). Although the Court agrees that Hartzell does not have to notify the FAA every time an employee raises a concern with an aircraft component, Hartzell does have a duty to investigate propeller failures and report the cause of propeller failures to the FAA, whether or not it reaches the same conclusion about the failures as its employees. To the extent that *Rickert* holds to the contrary, the Court disagrees with the decision.

The court in *Rickert* issued two summary judgment opinions. In the first, *Rickert v. Mitsubishi Heavy Indus.*, 923 F.Supp. 1453, 1462 (D.Wyo.1996) ("*Rickert I*"), the court granted a motion for summary judgment on the ground that the suit was barred by GARA and there was no evidence of a knowing misrepresentation or concealment by the defendant. *Rickert* involved a claim that an air crash was caused by a faulty de-icing system. *Id.* at 1457. The court granted summary judgment despite the fact that the defendant's president received letters from the former general counsel of a subsidiary involved in the production of the accident plane which placed responsibility for a number of prior crashes on the MU–2's [the accident plane] deicing system. *Id.* at 1460–1462. According to these letters, the defendant was "more concerned with product liability lawsuits than with aircraft safety." As a result of the reported de-icing system problem, the former general counsel stated "he would earnestly recommend that in the future, in order to save lives, FAA certification for flights into known icing conditions is withdrawn until further tests are conducted." *Id.* at 1461. The plaintiffs in *Rickert I* also produced evidence of a number of MU–2 accidents and articles discussing the plane's high accident rate. *Id.* at 1462. Although defendant's president told the former general counsel that defendant was investigating the de-icing problem, there was no evidence of a report to the FAA. Notwithstanding this evidence, the court in *Rickert I* said it could not conclude that "Vinton's [, the defendant's former general counsel,] letters show anything other than that Mitsubishi has, with respect to the design and performance of the MU–2, been obstinate, short-sighted, negligent, and perhaps reckless. Again, however, this does not mean that Mitsubishi knowingly misrepresented anything to, or concealed anything from, the FAA. Un-

der GARA, Vinton's letters must create a genuine issue of material fact by setting forth specific facts indicating that Mitsubishi knowingly misrepresented something to, or concealed something from, the FAA. His letters do not meet this test." *Id.* at 1462 (D.Wyo.1996).

In the second opinion, *Rickert v. Mitsubishi Heavy Indus.*, 929 F.Supp. 380 (D.Wyo.1996) ("*Rickert II*"), the court reversed its earlier decision and denied summary judgment after the plaintiff presented new evidence—affidavits from former employees of the defendant asserting that defendant deliberately kept problems with the de-icing system from the FAA. *Id.* at 382, 384. In an appendix to the *Rickert II* opinion, the court clarified its ruling in *Rickert I*, stating:

> As Rickert would have it, [the defendant] has an obligation—under Federal Air Regulation § 21.3—to report these differences of opinion to the FAA. This regulation cannot and does not require aircraft manufacturers to notify the FAA everytime that an engineer, a pilot, or a civilian writes that a particular aircraft should have been designed differently or that it is flawed. Were that the rule, aircraft manufacturers would spend most of their time reporting to the FAA and the FAA would be buried in reports noting differences of opinion concerning aircraft design and aircraft failure.
>
> More importantly, Rickert's understanding of Mitsubishi's obligations under FAR § 21.3 would effectively gut GARA. If this regulation required aircraft manufacturers to report all differences of opinion, then the failure to report these differences of opinion would constitute a "withholding." This "withholding," in turn, would satisfy one of GARA's exceptions and allow parties to bring suits 20, 30, or 40 years after the manufacture of an aircraft. . . .

*Id.* at 384.

■ Although this Court agrees that 14 C.F.R. § 21.3 does not require a manufacturer to report "all differences of opinion," this regulation requires a type certificate holder to report failures, investigate failures, and report design defects to the FAA. Under this Court's reading of 14 C.F.R. § 21.3 and the applicable DOA regulations, aircraft component manufactures, such as Hartzell, are required to investigate component failures and accurately report the results of such investigation to the FAA. To the extent *Rickert* holds otherwise, the Court disagrees with the decision.[12] A manufacturer's failure to produce evidence of its investigation into reported component failures is sufficient to raise an inference of concealment or withholding. Direct evidence of intentional concealment, such as an affidavit asserting intentional concealment, is not necessary to survive summary judgment.

Plaintiffs have submitted evidence of propeller failures of the model involved in this case. In section of III(C)(3)(a) of this Memorandum, the Court concluded that there is a genuine issue of material fact with respect to whether Hartzell misrepresented or concealed or withheld the cause of these failures. Any such misrepresentation or concealment or withholding involves information required by the FAA.

**e. Casually Related**

Plaintiffs have produced evidence of propeller failures and raised a genuine issue of material fact with respect to whether Hartzell misrepresented or concealed the

---

**12.** The court in *Rickert* did not discuss whether the defendant in that case had Delegated Option Authority ("DOA") from the FAA.

cause of these failures. *See supra* § III(C)(3)(a). On this issue, Mr. Twa testified that "[i]t is Hartzell's responsibility to both identify and quantify these high damaging stresses and provide an engineering design change to move these stresses out of the aircraft rpm range, or eliminate them altogether." Pls.' Resp. Ex. C. (Twa Aff.) 11. In Mr. Twa's opinion, if an engineering design change could not "move the damaging stresses out of the normal RPM operating range," the propeller was not "suitable for installation" in the accident aircraft. *Id.* Ex. C (Investigation Opinions and Conclusions) at 5. Continuing, Mr. Twa opines that if information about high vibratory stresses had been revealed to the FAA, "the FAA could have taken the necessary corrective measures that could have prevented an accident such as the one involving Michael and Wendy Robinson." *Id.* Ex. C (Twa Aff.) 16. Based on this evidence, there is a genuine issue of material fact with respect to whether Hartzell misrepresented or concealed or withheld information about propeller failures that was casually related to the accident in question.

Plaintiffs have submitted evidence sufficient to create genuine issues of material fact with respect to whether Hartzell (1) knowingly misrepresented, or concealed, or withheld; (2) required information that was material and relevant; and (3) casually related to the harm they suffered. Thus, the Court denies Hartzell's Motion for Summary Judgment Pursuant to the General Aviation Revitalization Act of 1994 on the ground that plaintiffs have satisfied the elements of GARA's "knowing misrepresentation or concealment or withholding" exception to GARA and the statute of repose is inapplicable.

## D. GARA § 2(a)(2): NEW PARTS

In the alternative, plaintiffs claim that the addition of new parts to the aircraft causally related to the accident less than eighteen years before the accident at issue should prevent this cause of action from being time barred. Under GARA § 2(a)(2), a new eighteen year period begins when a new part is added to an aircraft if this part is alleged to have caused an accident.[13] GARA § 2(a)(2). First, plaintiffs argue that GARA does not bar this claim because the accident was caused by a maintenance manual issued in 1984, fifteen years before the accident. Second, plaintiffs posit that a complete overhaul of the propeller in 1989 rendered the propeller a "new part" for purposes of GARA. The Court rejects both arguments.

### 1. *Maintenance Manual*

■ Plaintiffs argue that a defective overhaul manual promulgated by Hartzell in 1984 was a "new part" under GARA, and the issuance of this manual started the repose period for a claim based on these instructions. NEPS also submitted a response based on this argument. Defendant New England Propeller Service, Inc.'s Response in Opposition to Defendant Hartzell Propeller, Inc.'s Motion for Summary Judgment ("NEP's Response") at 4–6.[14]

---

**13.** No civil action arising out of an accident involving a general aviation aircraft may be brought against the manufacturer of a new component if the accident occurred—"with respect to any new component, system, subassembly, or other part which replaced another component, system, subassembly, or other part originally in, or which was added to, the aircraft, and which is alleged to have caused

such death, injury, or damage, after the applicable limitation period beginning on the date of completion of the replacement or addition." GARA § 2(a)(2).

**14.** Hartzell argues that NEPS lacks standing to oppose Hartzell's Motion for Summary Judgment because it has filed no crossclaims against Hartzell and its rights and/or liabili-

A number of courts have held that GARA's statute of repose cannot be avoided by recasting a claim based on the negligent design of an aircraft component as a negligence claim based on a maintenance manual's failure to warn. In *Carolina Industrial Products, Inc. v. Learjet, Inc.*, 189 F.Supp.2d 1147, 1170 (D.Kan.2001), the court granted summary judgment because the plaintiff's claim was barred by GARA's statute of repose. The plaintiffs in *Carolina Industrial Products* argued that the maintenance manuals and flight manuals covering a plane's landing gear failed to warn owners about a defect in the landing gear hydraulic and failed to instruct owners to fix the defect. *Id.* at 1171. Following a long line of precedent, the court held that a failure to warn is not sufficient to avoid a statute of repose. *See Alter v. Bell Helicopter Textron, Inc.*, 944 F.Supp. 531, 538–39 (S.D.Tex.1996) (applying GARA); *Burroughs v. Precision Airmotive, Corp.*, 78 Cal.App.4th 681, 93 Cal.Rptr.2d 124, 139 (2000) (applying GARA); *Schamel v. Textron–Lycoming*, 1 F.3d 655, 657 (7th Cir.1993) (applying Indiana statute of repose); *Alexander v. Beech Aircraft Corp.*, 952 F.2d 1215, 1220 (10th Cir.1991) (applying Indiana statute of repose). The rationale for these cases is as follows:

> To hold that [the defendant] should be liable because its manuals issued within the period of repose did not provide an adequate means of correcting the design flaw of the critical component, would be to circumvent the statute of repose by providing a back door to sue for the design flaw—ostensibly not for the design flaw itself, but for the failure of the manuals to adequately correct the flaw.

The result would be the evisceration of the statute of repose.

*Alter v. Bell Helicopter Textron, Inc.*, 944 F.Supp. 531, 539–40 (S.D.Tex.1996) (quoting *Butchkosky v. Enstrom Helicopter Corp.*, 855 F.Supp. 1251, 1257 (S.D.Fla. 1993)).

The court in *Carolina Industrial Products* distinguished *Caldwell v. Enstrom Helicopter Corp.*, 230 F.3d 1155, 1158 (2000), the case relied upon by plaintiffs, by explaining that the accident in *Carolina Industrial Products* was not caused by a defective manual but by the manual's failure to warn about a defect in the landing gear. *Id.* at 1171. In contrast, *Caldwell* involved a recent change in a flight manual which was alleged to be the proximate cause of the accident. *Carolina Indus. Prods.*, 189 F.Supp.2d at 1171.

In *Caldwell*, the Ninth Circuit held that a revised helicopter flight manual could be considered a "new part" for GARA purposes. *Caldwell*, 230 F.3d at 1158. The manual failed to include a warning that the last two gallons of fuel could not be used, and the pilot was unaware of that problem. As a result, the helicopter ran out of fuel and crashed. *Id.* at 1156. In *Caldwell*, the plaintiffs did not allege that the accident was caused by the manual's failure to warn owners of a defective system or component on the aircraft; instead, they contended that the accident was caused solely by the defective manual. *Id.* at 1156–57. The *Caldwell* court agreed with plaintiffs and distinguished the failure to warn cases by stating that the plaintiffs did not assert a failure to warn but "that the revised manual itself is the defective product that

---

ties will not be effected by the Court's ruling on this Motion. Hartzell's Com. Reply at 4, n. 7. In its response to Hartzell's motion, NEPS repeats plaintiffs' argument that Hartzell's overhaul manual should be considered a new part. NEPS's Resp. in Opp'n to Hart-

zell's Mot. for Summ. J. at 6. Because all issues raised by NEPS are addressed by plaintiffs, the Court does not rely on NEPS's response and declines to rule on the standing issue at this time.

caused the accident." *Id.* at 1157. With respect to this issue, the Ninth Circuit also stated that a flight manual is a part of an aircraft because it contains instructions necessary to operate the aircraft.

Despite plaintiffs' argument in this case that the 1984 overhaul manual "proximately" caused the accident, the affidavit they rely on to make this argument demonstrates that they actually allege a failure to warn. According to Dr. McSwain's affidavit, the inspection procedures in the overhaul manual were "defective" because they "were inadequate to detect the pitting on the surface of the blade that led to the fatigue failure and blade separation." Pls.' Resp. Ex. A (McSwain Aff.) 10(u). Among other criticisms, Dr. McSwain opines that the overhaul manual should have required inspection for corrosion with a 10X magnifying glass. Pls.' Resp. at 17–18 & Ex. A (McSwain Affidavit) 10(t). Plaintiffs also claim the maintenance manual did not provide any overhaul instructions for soft alloy propellers, like the propeller at issue. Pls.' Supp. Resp. at 8. According to plaintiffs, these inspection requirements were necessary because the accident propeller had "a propensity for corrosion pitting and intergranular attack." *Id.* 10(b). As a result, the combination of this poor material and "the accident propeller blade's inability to withstand vibratory stresses, the corrosive operation environment, the undamped engine vibration condition, and the inadequate inspection procedures in the overhaul manual proximately caused the accident." Pls.' Resp. at 4.

Plaintiffs' arguments focus on the overhaul manual's failure to provide adequate inspection requirements for the detection of corrosion—corrosion that was present because of the soft aluminum alloy used to make the propeller. The alleged failure of the manual adequately to warn aircraft owners about this defect in the propeller blade did not proximately cause the accident. Because the 1984 overhaul manual is not "alleged to have caused" plaintiffs' injury, plaintiffs cannot rely on the date of its issuance as an appropriate date to start the statute of repose.[15]

Even if plaintiffs' evidence supported a conclusion that the overhaul manual proximately caused the propeller failure, they would not be able to satisfy the requirement of *Caldwell* that a flight manual only "falls within GARA's rolling provision" when the defendant "substantively altered, or deleted, a warning [alleged to have caused the accident] from the manual within the last 18 years, and it is alleged that the revision or omission is the proximate cause of the accident ..." *Id.* at 1158. Plaintiffs in this case have not submitted evidence that Hartzell deleted or altered instructions for inspection with a magnifying glass or removed or altered instructions for the overhaul of soft alloy blades when the 1984 manual was issued. Thus, for the additional reason that no "new part" was "added" to the aircraft or "replaced" an aircraft component when the overhaul manual was issued in 1984, the statute of repose should not begin on that date.[16] GARA § 2(a)(2).

**15.** Because the Court rules on this ground— that plaintiffs have not offered any evidence that the overhaul manual proximately caused the accident—it is not necessary for the Court to address Hartzell's argument that this case should be distinguished from *Caldwell* on the basis that *Caldwell* involved a flight manual as opposed to an overhaul manual. Hartzell's Combined Reply at 7–8.

**16.** Because the Court has ruled that deficiencies in the 1984 overhaul are not a basis for re-starting the GARA statute of repose, Hartzell's motion in limine to exclude testimony relating to the insufficiency of these manuals is not relevant to the GARA motion and the Court will deny the motion in limine without prejudice. Hartzell's Mot. in Limine to Pre-

### 2. *Propeller Overhaul*

 Plaintiffs' final GARA argument is that an overhaul of the accident propeller in 1989 rendered the propeller a "new part." GARA provides that every new part or component that is added to the aircraft is subject to a new eighteen year statute of repose. "Since almost every major component of the aircraft will be replaced over its lifetime, the 'rolling' aspect of the statute of repose was intended to provide that victims and their families would have recourse against the manufacturer of the new component part . . ." *Burroughs v. Precision Airmotive Corp.*, 78 Cal.App.4th 681, 93 Cal.Rptr.2d 124, 132 (2000). According to plaintiffs, there is evidence that an overhaul of the accident propeller was conducted in 1989, and this overhaul "essentially" restored the propeller to its original "physical properties." Pls.' Resp. at 19 & Ex. B (Aff. of Don Sommer) 8. Thus, argue plaintiffs, it should be considered a "new part" and the statute of repose for the propeller should start on the date of the overhaul.

Plaintiffs rely on a law review article for the proposition that a comprehensive overhaul "retoll[s]" the statute of repose. Pls.' Resp. at 19 (quoting Robert F. Hedrick, *A Close and Critical Analyis of the New General Aviation Revitalization Act*, 62 J. Air L. & Com. 385, 403 (1996)). In support of that position, the author argues that it would not make sense for the person overhauling a part to be protected from liability just because the part being overhauled is more than eighteen years old. Hedrick, *supra*, at 403.

The Court rejects plaintiffs' argument on this issue. First, the article is not precedent and plaintiffs do not point to any caselaw in support of their argument. Although the Court's research did not disclose any case law addressing this argument under GARA, a federal court applying a state statute of repose rejected a similar argument. In *Butchkosky v. Enstrom Helicopter Corp.*, 855 F.Supp. 1251 (S.D.Fla.1993), the court stated:

> A holding that would toll the statute of repose on a product on account of an overhaul of a critical component of that product would effectively eviscerate the statute of repose as it applied to many types of products. For example, aircraft are required by statute to be routinely overhauled, and certain critical parts must be repaired or replaced on a regular basis. If every time a critical component was overhauled, or even replaced, the statute of repose began anew thus permitting an individual to sue for a design flaw, then the manufacturer of the aircraft would never be afforded the protection of the statute of repose.

*Id.* at 1255. This Court agrees with the rationale of *Butchkosky* on this issue. Second, the article's conclusion conflicts with the language of the statute. Under the statute, the statute of repose starts when a new component "replace[s]" another component or is "added" to the aircraft. GARA § 2(a)(2). An overhauled propeller does not replace another propeller and it is not added to the aircraft. It is removed for maintenance and returned to the aircraft. Finally, the concern of the author about shielding maintenance organizations from liability is not justified. Under the statute, only "manufacturers" of aircraft or components are shielded by the statute of repose, not repair facilities.

The Court's conclusion is not altered by plaintiffs' argument that Hartzell asked the FAA to treat overhauled propellers as new parts. Plaintiffs incorrectly state that Hartzell is "seeking" a statement from the

clude Expert Testimony Relating to the Insuf-

ficiency of Hartzell Manuals at 1.

FAA that a propeller loses its type certificate if it is not properly maintained. Pls.' Supp. Resp. at 2. According to the testimony relied upon by plaintiffs, Hartzell asked the FAA whether a propeller loses its type certificate if it is not properly maintained; it took no position on this issue. Pls.' Supp. Resp. at Ex. A (Dep. of Robert Edinger, at 68–69).

The Court also rejects plaintiffs' contention that the following language from the federal regulations supports the proposition that the FAA gives a component a new date of manufacture every time a component meets FAA approved requirements: "The date of manufacture of an airplane is the date the inspection acceptance records reflect that the airplane is complete and meets the FAA-approved type design data." 14 C.F.R. § 91.313(g)(1) (2003).[17] This regulation not only fails to support plaintiffs' argument, it provides that there is only one date of manufacture.

Thus, the Court rejects plaintiffs' argument that an overhauled propeller should be considered a new part for purposes of restarting the GARA statute of repose.

### E. NEW ENGLAND PROPELLER SERVICE'S MOTION FOR SUMMARY JUDGMENT

The 1989 maintenance action is also the basis for plaintiffs' claims against NEPS. According to aircraft logs, the propeller was removed from the airplane for maintenance in 1989. The parties dispute what maintenance was done and who performed the maintenance. Defendant NEPS argues that "plaintiffs cannot prove that NEPS had any involvement whatsoever with the aircraft propeller that is the subject of the lawsuit." NEPS's Mot. for Summ. J. ("NEPS's Mot.") at 1. In the alternative, NEPS claims that, even if it did perform an overhaul, "no expert witness can testify that any action or inaction on the part of NEPS contributed to the failure of the subject propeller." NEPS's Mot. at 1.

#### 1. *Evidence that an Overhaul was Conducted*

■ According to plaintiffs, the propeller was sent to defendant New England Propeller Services ("NEPS") for overhaul pursuant to both Hartzell's Overhaul Manual and maintenance required by AD 77–12–06. To substantiate this claim, plaintiffs provide maintenance records from the aircraft and the affidavit of Dr. McSwain.

The maintenance records, labeled "Airworthiness Directive Compliance Record" and "Airworthiness Directives," contain an entry stating that AD–77–12–06 was preformed on plaintiffs' airplane by "N.E. Propeller" in July of 1989. Pls.' Mot. in Opp'n to NEPS's Mot. for Summ. J. ("Pls.' Resp. to NEPS") Ex. C (Airworthiness Directives), Ex. D (Airworthiness Directive Compliance Record). The flight log also contains the following entry signed by J. Hardy: "removed Hartzell propeller for 77–12–06 AD—Accomplished by N.E. Propeller. See yellow tag back of this book—Reinstalled on A/C." *Id.* Ex. E (Flight Log).[18]

---

17. Plaintiffs' cite 14 C.F.R. § 91.314(g)(1), but the above cited regulation currently includes the language quoted by plaintiffs.

18. NEPS argues that the logbook entries are inadmissible hearsay. The Court rejects this argument.

Business records may be admitted into evidence if (1) they are made near the time that the maintenance was performed, (2) they are made by a person knowledgeable about the maintenance, (3) they are kept in the course of a regularly conducted business activity, (4) it is the regular practice of the business to make such records, and (5) there is nothing

Dr. McSwain stated in his affidavit that chemical analysis of the propeller revealed that both an overhaul and maintenance required by AD 77–12–06 were performed. That conclusion was based on Dr. McSwain's finding that polyurethane paint was uniform in composition and appearance over the entire blade surface. *Id.* at Ex. A, McSwain Aff. 10(m), 10(n) & Materials Engineering Report at 5–6. According to Dr. McSwain, AD 77–12–06 only requires repainting the blade in the shank radius area, not the entire blade, leading him to conclude that both AD 77–12–06 maintenance and an overhaul were performed. *Id.* 10(q).

In response, NEPS provided the affidavit and deposition of its President, Arthur D'Onofrio, stating that the company has no records dating back to 1989. *Id.* at Ex. C (D'Onofrio Aff.) 5–8 & Ex. E (D'Onofrio Dep.) at 20, 41. NEPS also claims that the maintenance record entries provided by plaintiffs were not made by NEPS and the person whose name appears next to the entries, J. Hardy, is deceased and not subject to cross examination. *Id.* at 3 & Ex. C (D'Onofrio Aff.) 10.

Plaintiffs respond that John Hardy, an employee of the Little Brook, Maine airport, was the airplane's mechanic in 1989. According to plaintiffs, Hardy signed the logbook entries showing that the accident propeller was sent to "N.E. Propeller" for maintenance. Pls.' Resp. to NEPS at 9 & Ex. C (Airworthiness Directives Record), Ex. D (Airworthiness Directive Compliance Record), Ex. E (Flight Log). As evidence that this signature was Mr. Hardy's, plaintiffs submitted the affidavit of Jean Hardy, John Hardy's widow. *Id.* at Ex. J (Jean Hardy Aff. 3). In her affidavit, she identifies the signatures and entries as those of her husband. *Id.* 3. She also states that her husband "dealt with New England Propeller Service." *Id.* 4. Although not completely supported by Ms. Hardy's affidavit, plaintiffs also submitted records provided by Ms. Hardy that plaintiffs claim is the bottom half of an invoice from NEPS for the overhaul of the accident propeller in the total amount of $742.50.[19] *Id.* Ex. J, Tab B at 2.

At oral argument, NEPS asserted that the invoice supports an inference that only maintenance related to AD 77–12–06 was performed. Ms. Hardy submitted an invoice for maintenance performed by NEPS on a different aircraft to show that the

---

that indicates a lack of trustworthiness in the records. Fed.R.Evid. 803(6).

With respect to the trustworthiness of these records, Federal Aviation Regulations require mechanics to make entries in the maintenance records and forbid false entries. 14 C.F.R. §§ 43.9(a), 43.12(a)(1). Regarding the remaining requirements, the mechanic who made the entries, John Hardy, is dead. However, Rule 803(6) allows "other qualified witness[es]" to testify to these foundational requirements. This witness must have "familiarity with the record-keeping system and the ability to attest to the foundational requirements of Rule 803(6)." *United States v. Console*, 13 F.3d 641, 656 (3d Cir.1993).

According to plaintiffs, Jean Hardy, John Hardy's widow, ran the Little Brook Airport with her husband. Pls.' Mot. in Opp'n to NEPS's Mot. for Summ. J. at 10. Although not sufficient to establish a foundation for the admissibility of the contested evidence, the Court notes that plaintiffs represent they "will be able to lay the proper foundation for admission of the logbook entries into evidence at trial." Pls.' Resp. to NEPS's Mot. to Exclude at 15. Because the aircraft maintenance records and documents produced by Ms. Hardy are "capable of being admissible at trial" as business records, the Court will consider them for purposes of this Motion. *Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 (3d Cir.1996)

19. The invoices are addressed to James Flanagan, the owner of plaintiffs' aircraft in 1989. Pls. Mot. in Opp'n to NEPS's Mot. for Summ. J. at 9, Ex. H (Certified Chain of Ownership).

format of the invoice for plaintiffs' aircraft matched the NEPS · invoice ·format. *Id.* Ex. J, Tab B at 3. According to NEPS, the latter invoice shows that the price for the maintenance required by AD 77–12–06 alone was $675. Tr. at 168–69. NEPS represents that "the price of [AD 77–12–06 compliance] and the price of overhaul would not even come close to [the $742.50 charged for the maintenance of plaintiffs' aircraft]." Tr. at 169.

The testimony of Dr. McSwain and the maintenance records, when combined with the affidavit of Ms. Hardy, are sufficient to raise a genuine issue of material fact with respect to whether NEPS performed both a propeller overhaul and maintenance required. by AD 77–12–06. NEPS's argument regarding the cost of the overhaul is relevant to this determination but not dispositive; it raises a genuine issue of material fact for the jury to resolve.

### 2. *Evidence of Negligent Overhaul*

In the alternative, NEPS claims that, even if they did perform maintenance on the accident propeller, "no expert witness can testify that any action or inaction on the part of NEPS contributed to the failure of the subject propeller." NEPS's Mot. at 1. NEPS argues that plaintiffs' experts are either not qualified to testify about propeller overhaul or do not criticize the overhaul that was performed.

As evidence that NEPS negligently performed maintenance, plaintiffs provide affidavits and reports from Jerry Foster and Dr. McSwain. Plaintiffs argue that corrosion pits were present when NEPS performed maintenance and "should have been removed at that time." Pls.' Resp. to NEPS at 3. According to Dr. McSwain, "[t]he failure of [NEPS] to completely remove the corrosion pits from the subject Hartzell 'Y' shank blade and to apply polyurethane paint over the corrosion pits

made subsequent detection of the corrosion pitted condition unlikely." Pls.' Resp. at 4, Ex. A (McSwain Aff.) 10(r). Mr. Foster substantiates Dr. McSwain's opinion that the surface pits and intergranular corrosion were not discovered during the last overhaul. Pls.' Resp. Ex. E (Foster Rule 26 Statement) D.

NEPS argues that, although plaintiffs' expert Jerry Foster is "qualified to opine upon the quality of work done by a propeller repair station" because he has worked as propeller technician since 1968, Dr. McSwain is a metallurgist and not qualified to offer the opinion that the propeller was overhauled improperly. NEPS's Mot. at 7–9. As set forth in more detail infra, the Court concludes that Dr. McSwain is qualified to testify about the maintenance performed by NEPS. *See infra* § III(E)(3).

NEPS relies on Mr. Foster's opinion to argue that, even if the corrosion pits were not detected during the overhaul, this failure resulted from Hartzell's inadequate maintenance instructions, not NEPS's negligence. On that issue, Mr. Foster states that "surface pits and inter granular corrosion" were "not discovered at the last overhaul" because Hartzell's overhaul procedures were "not sufficient to find subsurface or inter granular corrosion." *Id.* at 7–8, Pls.' Resp. at Ex. E D. Dr. McSwain also opines that Hartzell's inspection procedures were "inadequate to detect the pitting on the blade" because "the pits on surface of the subject Hartzell 'Y' shank blade were not detectable visually without magnification" and the Hartzell overhaul procedure did not require an inspection with magnification. *Id.* Ex. A (McSwain Aff.) 10(u), (McSwain Materials Engineering Report) 4.0(12), 4.0(19).

Although NEPS's argument is relevant to issues related to contribution or indemnity, NEPS's reliance on Hartzell's main-

tenance instructions is not a complete defense to liability. This defense also raises questions of fact that have not been addressed by either party such as whether a reasonable mechanic would have inspected the propeller with a magnifying glass even without an instruction in an overhaul manual. As a result, on the current state of the record, summary judgment is not appropriate and NEPS's Motion for Summary Judgment is denied.

### 3. *Motion in Limine to Preclude Testimony of Dr. McSwain*

NEPS argues that Dr. McSwain lacks the requisite expertise to offer opinion testimony on whether the subject propeller was overhauled and the quality of overhaul work. NEPS's Mot. to Exclude Pls.' Expert Richard H. McSwain from Testifying Regarding Propeller Overhaul ("NEPS's Mot. to Exclude McSwain") at 1. NEPS argues that Dr. McSwain is a metallurgist without specialized knowledge of aircraft propellers and as a result "any opinion that the subject propeller had been overhauled, let alone overhauled improperly, is unreliable and should be excluded." *Id.* at 4.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court listed a "trilogy of restrictions" that need to be addressed before a court allows expert testimony—qualification, reliability and fit. *Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir.2003). NEPS objects to Dr. McSwain's qualifications, not the technique he used to reach his conclusions or the reliability or fit of the evidence. Thus, only the first of the triology of restrictions—qualification—is at issue.

The Third Circuit has instructed courts to interpret the qualification requirement "liberally" and to not to insist on a certain kind of degree or background when evaluating the qualifications of an expert. "The language of Rule 702 and the accompanying advisory committee notes make clear that various kinds of 'knowledge, skill, experience, training, or education,' qualify an expert as such." *In re Paoli R. Yard PCB Litigation,* 916 F.2d 829, 855 (3d Cir.1990) (quoting Fed.R.Evid. 702). Applying this standard in *Tormenia v. First Investors Realty Co., Inc.,* 251 F.3d 128, 135–36 (3d Cir.2000), the Third Circuit held that it was not an abuse of discretion for the district court to admit testimony about revolving doors by an expert who had testified in only two prior lawsuits involving revolving doors when the expert held a master's degree in civil engineering and based his testimony on his experience with mechanical devices that used the same principles as revolving doors.

In ruling on NEPS's Motion for Summary Judgment, the Court relied on three of Dr. McSwain's opinions: (1) based on a chemical analysis of polyurethane paint on the blade, both an overhaul and AD 77–12–06 maintenance were performed on the blade; (2) based on the fact that this paint covered corrosion pits on the blade, the corrosion pits were not removed when the overhaul was performed; (3) based on a reading of the Hartzell overhaul manual, these corrosion pits should have been removed during the overhaul.

■ Dr. McSwain's background in metallurgy and materials failure analysis qualify him to analyze the paint of the blade and determine that this paint covered corrosion pits. Dr. McSwain's curriculum vitae discloses that he has spent more than twenty-five years conducting failure analysis of aircraft. Pls.' Resp. to NEPS's Mot. to Exclude at Ex. C. He has "analyzed hundreds of failures in aluminum components due to corrosion pitting." *Id.* at Ex. C (McSwain Aff.) 9. In his consulting practice, he has "analyzed rotor

blade and propeller blade failures, including fatigue failures from corrosion pits." *Id.* 12. In September 1998, Dr. McSwain completed a course in Fourier Transform Infrared Theory, Sample Handling and Spectral Interpretation, the method used to analyze the paint on the blade. *Id.* (Curriculum Vitae). This experience and training are sufficient to permit Dr. McSwain to opine on this issue.

Dr. McSwain's opinion that the corrosion should have been removed during overhaul is supported by the Hartzell Overhaul Manual. According to the manual, "following blade rework it will be necessary to inspect the blade to be sure all intergranular corrosion and cracks have been removed." *Id.* Ex. E (Hartzell Blade Repair Specifications Manual 133–B) at 29. The manual also states that "All propellers in service are subjected to a certain amount of surface erosion and corrosion.... There have been a number of blade failures from this type of corrosion." *Id.* Based on the manual and his experience analyzing corrosion ·failure of aircraft propellers, Dr. McSwain is qualified to opine that all corrosion pits should have been removed during the overhaul of the blade.

### F. CONSTITUTIONALITY OF GARA

Plaintiffs present four arguments in an effort to challenge the constitutionality of GARA. First, plaintiffs argue that GARA takes away "guaranteed state law rights" in "an area of traditional state regulation and control" by taking away "an individual's right to be heard in court." Pls.' Supp. Resp. at 9. Second, plaintiffs argue that GARA does not "substantially affect" interstate commerce and Congress does not have constitutional authority for the legislation. *Id.* Third, plaintiffs argue that GARA unconstitutionally compels · state courts to enforce a federal regulatory statute of repose. *Id.* at 10. Finally, plaintiffs argue that GARA violates the equal protection clause of the Fourteenth Amendment because Congress could not have a rational basis for distinguishing between manufacturers of general aviation aircraft and manufacturers of other aircraft. *Id.* at 11.

■ With regard to plaintiffs' first argument, the Ninth Circuit rejected a similar argument in *Lyon v. Agusta S.P.A.,* 252 F.3d 1078 (2001). In upholding the constitutionality of GARA, the circuit court concluded that the plaintiffs did not have a vested property right in their cause of action. *Id.* at 1086. On this issue, the court ruled that a property right in a cause of action does not vest until a final unreviewable judgment is obtained. *Id.* The court further stated that "barring irrational or arbitrary conduct, Congress can adjust the incidents ·of our economic lives as it sees fit." *Id.*

In GARA, Congress has not taken away plaintiffs' cause of action or right to be heard in court. It has only set a time limit for bringing an action.

■ The Court also rejects plaintiffs argument that GARA regulates an area of traditional state control. GARA regulates interstate commerce, traditionally an area of federal control. Congress was specifically granted the power to regulate interstate commerce in the Constitution. U.S. Const. art. I, § 8.

With respect to plaintiffs' separate commerce clause argument, in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the case relied upon by plaintiffs, "the Court reaffirmed Congress' plenary power over the channels and instrumentalities of interstate commerce." Laurence H. Tribe, *American Constitutional Law,* 826 (3d ed.2000). According to the Court in *Lopez,* "Congress

is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." *Lopez,* 514 U.S. at 558, 115 S.Ct. 1624. Moreover, as an example of legislation that constitutionally regulated an instrumentality of interstate commerce, the *Lopez* Court cited a statute criminalizing the destruction of aircraft. *Id.* (citing *Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971)).

The Court concludes that GARA properly regulates an instrumentality of interstate commerce, aircraft. Thus, plaintiffs' argument that GARA is not a valid enactment under the commerce clause is rejected.

■ Cases cited by plaintiffs for their third contention—the improper compulsion of state courts to enforce federal law—deal with the "commandeering" of state legislatures or state executive officials to enforce federal law. *See New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), Tribe, *supra,* at 878–80. In *New York v. United States,* the case cited by plaintiffs, the Court reaffirmed the power of Congress to pass laws enforceable in state courts, stating that this power was "well established." *New York,* 505 U.S. at 178, 112 S.Ct. 2408. In *Printz v. United States,* 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), the Court distinguished Congress's power over state courts from their power over state executive officials. Although the Court held that Congress could not "commandeer" state executive officials, it stated that "the Constitution was originally understood to permit imposition of an obligation on state judges to enforce federal proscriptions." *Id.* at 2371. Plaintiffs have not pointed to anything in the Constitution that prevents state courts from being required to enforce federal legislation. Thus, the Court rejects plaintiffs' argument relating to compulsion of state courts.

■ Finally, plaintiffs' equal protection argument fails. "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). There is at least one conceivable reason why Congress chose to distinguish between the general aviation industry and other sectors of the aviation industry when enacting GARA. According to the legislative history, "this is not just about small planes. The small plane industry is the genesis of the entire aviation industry. That is why companies like Boeing and McDonnell Douglas see this bill as critical to U.S. preeminence in the commercial aviation industry." 140 Cong Rec H 4998, H5001 (June 27, 1994) (statement of Rep. Glickman). Congress could rationally decide that it wanted to provide limited protection for this vulnerable segment of the aviation industry without limiting tort claims against commercial carriers in the hopes that the revitalization of the general aviation industry would spread to other sectors of the aviation industry. GARA is a legitimate exercise of legislative power and passes constitutional muster.

## IV. *CONCLUSION*

For the foregoing reasons, Hartzell's Motion for Summary Judgment pursuant to the General Aviation Revitalization Act of 1994 and NEPS's Motion for Summary Judgment are denied. Hartzell's motions to preclude the testimony of William Ray

Twa and Dr. Richard McSwain are granted with respect to their opinions on Hartzell's state of mind or scienter. The motions are denied in all other respects. Hartzell's Motion in Limine to preclude testimony on the sufficiency of its manuals is denied without prejudice. NEPS's motion to exclude Dr. McSwain's testimony is denied. These rulings in limine are without prejudice to the right of defendants to object to testimony and other evidence presented by these experts at trial.

An appropriate Order follows.